## DAVIS v. CHICAGO, R. I. & P. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. November 25, 1907.)

No. 2,464.

1. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—ACTS IN EMERGENCIES.

Where a person without fault on his part is brought suddenly into a situation of imminent danger, he is not chargeable with culpable negligence because he fails to take the best means of escape, and the party whose negligent act brought him into such perilous situation is not relieved from liability for his injury if he acts as a person of ordinary prudence might have done under the same circumstances.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, §§ 99, 100.]

2. RAILROADS—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

Where plaintiff and another driving a horse approached to within 25 feet of a railroad crossing, well known to them to be dangerous, at a trot, and even there could not see along the track for more than 50 to 150 feet nor hear signals given by an approaching train because of an intervening bluff and an adverse wind and the noise made by their vehicle, their action in driving upon the crossing without stopping to look and listen was negligent, and precluded plaintiff from recovering damages from the railroad company for an injury received by jumping out of the vehicle to avoid danger from an approaching train which they did not see until the horse had stepped upon the track.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, §§ 1043–1070.]

3. NEGLIGENCE—IMPUTED NEGLIGENCE—PERSONS DRIVING TOGETHER.

That a plaintiff at the time of his injury at a railroad crossing was riding in a vehicle with a friend who owned the horse and was driving did not relieve him from the duty of exercising ordinary care to avoid injury, and where he sat beside the driver, and made no objection when the latter negligently drove upon the track in front of an approaching train, such negligence is imputable to him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, §§ 147, 148.]

In Error to the Circuit Court of the United States for the District of Kansas.

Robert J. Brock, for plaintiff in error.

Paul E. Walker (M. A. Low, on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The plaintiff in error (hereinafter designated the plaintiff) sued the defendant in error (hereinafter desig-

nated the defendant) to recover damages for personal injuries. As the trial court at the close of the plaintiff's evidence directed a verdict for the defendant, a review of the case made is rendered necessary.

The plaintiff, a man of middle age, and one Pfeutze, resided in the town of Manhattan, Kan., a few miles distant from the crossing of the public highway over the track of the defendant railroad company where the accident in question occurred. On the morning of October 16, 1901, they left home in a two-seated rig drawn by one horse belonging to said Pfeutze, the latter driving, to visit some point in the country of mutual interest. They were close personal friends, and so traveled together in companionship. They approached the crossing in question from a northeasterly direction, the roads intersecting each other at right angles. A bluff from 150 to 200 feet high arose just west of the crossing, extending back some distance, cutting off the view of a train of cars coming from the west when the traveler approached this crossing, under conditions hereinafter disclosed. It was regarded as a very dangerous railroad crossing, a fact well known to the plaintiff and Pfeutze. They were quite familiar with this situation, having used this crossing frequently for a number of years. They admitted that as they approached the crossing they were engaged in general conversation, and trotted the horse to within 20 or 25 feet of the crossing before the driver slowed him to a walk. They did this when, according to their testimony, they knew that at a distance of about 30 feet from the track they could not see a train coming through the cut from the west a greater distance than 50 feet; though the actual measurement and experiments made demonstrate that 34 feet back from the track a train could have been seen at a distance of about 90 feet. At a distance of 15 feet from the crossing the proof showed that the train could be seen 232 feet. They comprehended the fact on approaching the point of intersection that a train might appear at any time, and therefore they testified that in approaching the crossing they looked and listened therefor; that hearing no signal they drove onto the track without stopping; and just as the horse's forefeet reached the north rail the plaintiff observed the train coming, when the driver applied the whip to the horse and safely cleared the crossing before the engine arrived. The plaintiff, taking alarm, sprang from the vehicle, alighting on the south side of the track, and in the fall received injury to one of his knees, more or less serious, for which injury this action was instituted. If the plaintiff's own negligence or want of due care did not contribute to bringing him into such perilous situation, it is to be conceded that his act in leaping from the vehicle, although he would not have been injured had he remained seated, would not disentitle him to maintain action for damages. When a person, without fault on his part, is brought suddenly into a situation of imminent danger, not admitting of opportunity for the exercise of deliberate judgment as to the better means of escape, culpable negligence is not to be imputed to him for not selecting the better course. If under such circumstances he makes such choice as a person of ordinary prudence placed under like conditions would

make, and injury thus comes to him, it would not relieve the party from accountability therefor whose negligent act brought him into such perilous situation. Omaha Water Company v. Schamel, 147 Fed. 502, 78 C. C. A. 68, loc. cit. The same may be said of the action of Pfeutze in not pulling his horse back off the track when he discovered the approach of the train if his forefeet were already over the first rail, provided he was not guilty of contributory negligence.

The actionable negligence of the defendant charged in the petition is as follows: In propelling said train over said crossing without ringing the bell or sounding the whistle, and without giving or attempting to give any sufficient warning or signal of its approach, when the defendant well knew that it was a most dangerous crossing, and that the ordinary warning of the bell and whistle would be wholly ineffectual to protect persons entering upon said crossing; and in approaching said crossing at a dangerous rate of speed; and failing to maintain a watchman and gates at the crossing, and not providing proper signals giving notice of the approach of trains.

The plaintiff knew that neither watchman nor gates, nor appliances for signals, were kept and maintained at said crossing. Of what avail would the presence of a watchman to operate gates have been in view of the plaintiff's evidence? As the train was not running on schedule time, being about three hours late, a watchman would not have known the moment of its coming. And as the plaintiff and Pfeutze, if they are to be credited, notwithstanding their vigilance, did not discern the approach of the train until the horse was on the near rail, it must be conceded that the watchman, if there, would have been in the same predicament in giving timely warning. If it be said that he could have warned them not to enter upon the track without first stopping, the answer is that they already possessed the same knowledge as would the watchman, that the place itself was a warning of danger, and therefore they should have stopped with or without such outside warning. Any warning by a watchman would have conveyed to them only what they already knew as well as he did. If they could not hear any signals the watchman could not have heard any. They therefore had the same reason for stopping before entering upon the crossing that the watchman would have had for warning them to do so. They knew, on approaching this crossing, that no appliances were employed there by the railroad company for giving signal of the approach of a train, and therefore that they could not rely thereon for their protection and safety. All the more, therefore, should they have depended upon their quickened senses and increased precaution in approaching the crossing.

The allegation respecting the dangerous rate of speed of the train is not supported by any evidence that would have warranted the jury in finding the existence of such fact. The only witness to this issue was one Cooper, who, according to his statement, was about 150 yards northeast of the crossing, following on the same road in the rear of the plaintiff. Remarkably enough, in view of the plain-

tiff's evidence that they could not see the crossing until they were within about 30 feet of it, this witness claimed that he saw the train 150 yards to the northeast, when it was about 50 feet from the crossing, although he did not see the accident. Indisputably, he had but a mere glimpse of one or two seconds of the train. From which it is manifest that any expression of opinion by him as to its rate of speed was the merest speculation and guesswork. He said he thought it was running from 40 to 45 miles an hour. There was nothing whatever at the instant to fix his mind upon the matter of the speed, and his cross-examination developed that he had never experimented from a side view to determine the rate of speed of a passing train. As said in McGrail v. McGrail, 48 N. J. Eq. 532–536, 22 Atl. 582, 584:

"Nothing is more uncertain and unreliable than the testimony of witnesses as to the time occupied in a transaction."

Recognition of such mere guesswork as sufficient to carry the question to the jury of the rate of speed of a train has a long column of injustice to its account. This testimony, doubtless, and properly so, was treated as utterly worthless by the experienced judge who presided at the trial.

The only remaining ground of negligence worthy of consideration is the imputed failure of the defendant to sound the whistle or ring the bell when approaching the crossing. The statute of the state requires that one or the other of such signals should be given at least 80 rods from such public road crossing. The evidence on behalf of the plaintiff was that although they listened they did not hear such signal, as did also the witness Cooper. But the plaintiff's testimony was that on account of the obstruction of the long, high bluff and the adverse direction of the wind blowing at the time they might not have heard the sounds if given. The petition itself alleges that the defendant, on approaching this crossing, knew that "the ordinary warning of the bell and whistle would be wholly ineffectual to protect persons crossing the said crossing;" and in the brief of counsel for plaintiff it is admitted that "by reason of the obstruction caused by the bluff it was impossible for them to hear the train until it was dangerously close." In view of the rule of law that the servants of the defendant are presumed to have performed their duty in respect of giving the required signal, it devolved upon the plaintiff to overcome this presumption by satisfactory evidence to a reasonable mind. When the plaintiff himself thus, in effect, conceded that the whistle or bell, if sounded, probably would not have reached such traveler, it is somewhat remarkable that he should assume the position that he is entitled to recover damages by reason of the failure of the defendant to have given such signal, when the burden of proof rested upon the plaintiff to establish such omission by satisfactory evidence. If, however, this doubt should be resolved in favor of the plaintiff, what of the conduct of these travelers in approaching the crossing as they did? With full knowledge of the situation, as hereinbefore stated, they approached the crossing engaged in general conversation, indicating that their

minds were not fixed upon the probable approach of a train and giving heed to any sounds, on a slight down grade they suffered the horse to trot until they reached within 20 or 25 feet of the railroad track, and then in a walk entered upon the crossing without taking the precaution to stop; when, according to their statement, from the point where they stopped trotting, it was almost a physical impossibility for them to have discovered the approach of a train from between 50 and 100 feet away. Courts will take judicial cognizance of physical facts of common knowledge. Judges know without evidence taken that the clatter of a horse's hoofs on a road when trotting, and a vehicle thus in motion, under the most favorable circumstances, will make such an amount of noise as will obstruct the conveyance of sounds to the ear—that they lessen the chances of hearing distinctly. And therefore, on approaching a known place of danger at a railroad crossing, they should exercise a degree of care commensurate with the hazard to be encountered demanded of them, and, where both the senses of vision and hearing were thus obstructed, they should take the next ordinary, practical, and sensible course of stopping to look and listen. Instead of doing this, they drove onto the track; and in this connection it is important to note the evidence on behalf of the plaintiff. It is that when they first discovered the engine it was within 120 feet of them, and at that time the forefeet of the horse were over the first rail of the track. The uncontradicted evidence is, demonstrated by actual measurements and observations since made, that at a distance of 34 feet from the track an engine from the west could be seen 90 feet, and at a distance of 15 feet from the track the engine could be plainly seen 232 feet. Physical facts, it has been pungently said, never lie, but witnesses sometimes do. If the plaintiff and Pfeutze did not discover, as they testify they did not, the engine until it was within about 120 feet of them, it is clear proof that they were not looking for the engine when they drove onto the track; and that had they discovered it, as they should have done in the exercise of due vigilance, when it first came in view, the horse could have been readily stopped before entering upon the railroad track, or they would have had ample time to have passed clear of the track. The law is that in the absence of any tangible proof, as we have shown, of the rate of speed of the train, the presumption must be indulged that the engineer approached the crossing with due care, measured by a conscious sense of the danger that might likely be encountered there, and that after discovering the presence of the vehicle he did not recklessly run it down.

Pfeutze, touching this matter, testified as follows:

"Q. At a point up the road from where you came beyond twenty-five feet from the crossing, what could you observe in the direction of the railroad? A. Hardly nothing at all, except right at the crossing in front of the horse."

He further said:

"We expected a train from the west."

It is to be conceded, it seems to us, that under such conditions common prudence dictated that it was careless to recklessness to trot

on even a slight down grade up to within 25 feet of the track, and then walk immediately onto it without stopping to look and listen. Had he done so the injury would have been avoided beyond question. It is not a sufficient answer to this to say that the parties might have reasonably considered that, if they did stop and satisfy themselves that no train was in view and then proceeded, still they might have been caught before accomplishing the crossing. This suggestion, it seems to us, could be with equal logic employed in any instance where the party thus injured had failed to stop and listen. From a point known at the time to plaintiff and Pfeutze where the horse could have been stopped in safety, they could see the engine over 200 feet away, just as they did see it when the horse was in motion at the north rail of the track; so that the stubborn fact remains that if they had stopped for three or four seconds this lawsuit would have been avoided. Judge Day, sitting with Judges Lurton and Severens, in Shatto v. Erie Railroad Company, 121 Fed. 678–682, 59 C. C. A. 1, speaking to such suggestion, said:

"It is argued that it would have done no good to stop and listen. We cannot agree to this supposition; certainly not to the extent of exonerating the plaintiff from using the precautions obviously necessary for his protection, because they could not have changed the result. We think it only reasonable to suppose that, had he stopped and listened with open ears before going between the open cars, he would have heard the noise of the approaching train. Had he halted for a moment before going between the cars, the train would have passed in safety."

Chief Justice Doster, in A., T. & S. F. Railway Company v. Willey, 60 Kan. 819–825, 58 Pac. 472, 473, discussing a germane question, said:

"The pertinent facts, then, are that the plaintiff below could not see the approaching train because of obstructions to his view, nor could he hear it because of the noise of the wind in the grove of trees. He was, however, familiar with the crossing and all its surroundings. He knew that a train was liable to pass at any time. He knew that he could neither see nor hear its approach. He could, however, have seen or heard it if he had stopped just before his team passed to the end of the hedge nearest the track, which point was 28 feet from the nearest rail. He knew that he could not, for the reasons stated, either see or hear an approaching train without stopping at or about the end of the hedge. Under these circumstances the legal proposition of his obligation to stop, in order to assure himself of safety, is unquestionable. The law first laid him under the obligation to look and listen. This is undisputed. The exercise of the senses of sight and hearing were unavailing, and were known by him to be unavailing. The very contingency, then, in which the law laid him under the necessity of further precaution arose."

This rule has been again recognized by the Supreme Court of Kansas in C., R. I. & P. Railway Company v. Palmer, 61 Kan. 860, 60 Pac. 736, Walker, Receiver, v. Mercer, 61 Kan. 736–737, 60 Pac. 735, and in the recent case of M., K. & T. Railway Company v. Jenkins, 74 Kan. 487, 87 Pac. 702.

We are not called upon in this case to approve of the extreme proposition laid down by so distinguished a judge as Mr. Justice Sharswood in Railroad Company v. Beale, 73 Pa. 504, 13 Am. Rep. 753, "that the fact of the failure to stop immediately before crossing a railroad track is not merely evidence of negligence for the jury, but

negligence per se, and a question for the court." The duty to stop is a relative one. It depends upon the situation of the particular case, the knowledge the traveler has of the situation, and the reliance he may reasonably place under the circumstances on his opportunities for seeing and hearing without taking the last precaution of stopping. The authorities are quite in accord on the proposition that if the view is unobstructed so that an approaching train, before it reaches the crossing, can be seen, there is no occasion for the special exercise of the sense of hearing—listening; and therefore there is no reason why he should stop for that purpose. On the other hand, if the view is obstructed, interfering with the sense of sight, then he must bring into requisition the sense of listening carefully and attentively. And if there is any noise or confusion over which he has control, such as that of the noise of the horse's feet, or the grinding sound of the wheels, or the ordinary noise of the vehicle, interfering with the acuteness of the sense of hearing, it is his duty to stop such noise or interfering obstruction and listen for the train before going upon the track.

Mr. Chief Justice Alvey, in Railroad Company v. Hogeland, 66 Md. 149–161, 7 Atl. 105, 59 Am. Rep. 159, said:

"It is negligence per se for any person to attempt to cross tracks of a railroad without first looking and listening for approaching trains; and, if the track in both directions is not fully in view in the immediate approach to the point of intersection of the roads, due care would require that the party wishing to cross the railroad track should stop, look, and listen before attempting to cross. Especially is this required where a party is approaching such crossing in a vehicle, the noise from which may prevent the approach of a train being heard. And if a party neglects these necessary precautions, and receives injury by collision with a passing train, which might have been seen if he had looked, or heard if he had listened, he will be presumed to have contributed, by his own negligence, to the occurrence of the accident. * * * This is the established rule, and it is one that the courts ought not to relax, as its enforcement is necessary as well for the safety of those who travel in railroad trains as those who travel on the common highways."

So in Chase v. Railroad, 167 Mass. 383, 45 N. E. 911, it is said:

"If there is anything to obstruct the view of a traveler on the highway at a crossing at grade, it is his duty to stop until he can ascertain whether he can cross with safety."

Quite apposite to the case in hand is that of Seefeld v. C., M. & St. P. R. Company, 70 Wis. 216–222, 35 N. W. 278, 5 Am. St. Rep. 168, where the plaintiff drove toward a crossing where his view was obstructed, and the wind was blowing, and there were vehicles present which may have rendered hearing more difficult, the plaintiff being familiar with the dangerous condition of the crossing, and with knowledge that a train might be expected to pass at any moment. Mr. Justice Lyon, after full consideration of the authorities, approved the action of the trial court in directing a verdict for the defendant. He concluded by saying:

"The rule to be deduced from these cases is this: If the view of the traveler on the highway approaching a railroad crossing is so obstructed that he cannot see an approaching train in time to stop his team before colliding with it, if he knows a train is due at such crossing at or about such time, and if he is unable to hear the approaching train when his team is in motion, whether by reason of the force and direction of the wind or of noises in the vicinity,

whether made by his own wagon or by other causes, ordinary care requires him to stop his team while he may do so, and listen for the train."

In Shufelt v. Flint & P. M. R. Company, 96 Mich. 327, 55 N. W. 1013, the court said:

"These trains must run where the view is obstructed by cuts, by embankments, by trees, and by other things. He who does not choose to stop and listen, where he cannot see, must suffer the consequences of his own negligence."

In Henze v. St. L., K. C. & N. Ry., 71 Mo. 640, the evidence on the part of the plaintiff showed that with his infant child he was driving in a two-horse wagon, at a slow walk, along a highway where it crossed the railroad, when they were run over and killed by an extra train not running on time. The evidence tended to show that while no whistle was sounded or bell rung, the train made such noise that it could have been heard if the party had stopped and listened. Judge Henry said:

"If Henze had used the precaution which common prudence dictates, it is not likely that the calamity would have occurred. If he had stopped to look and listen when near the track, and could neither see nor hear the approaching train, on account of the cut or other obstructions, and no signal was given from the train, he would have been justifiable in attempting to cross, and no negligence would have been imputable to him. But he had no right to drive along over a dry, hard road in a two-horse wagon, the noise of which might prevent him from hearing an approaching train, and, without stopping an instant to see or hear, go upon the railroad track, except at his own peril."

In Stepp v. C., R. I. & P. Ry. Co., 85 Mo. 235, Judge Black said:

"If the crossing is obstructed from view increased caution is required on the part of the traveler as well as the company, and if, from noise, such as a gale of wind, or the rattling of a wagon, hearing is rendered difficult, then it would become the duty of the traveler to stop and listen."

In Merkle v. Railway Company, 49 N. J. Law, 473, 9 Atl. 680, the court, speaking of a case where the party is approaching the crossing with a wagon loaded with boxes and bottles, where he could not see an approaching train until within a few feet of the track, said:

"Inasmuch as he could not see an approaching train at any considerable distance from the track, ordinary prudence required him to stop when he was near enough to the railroad to ascertain, at least by listening, whether there was any danger or not."

In Blackburn v. So. Pac. Ry. Co., 34 Or. 215, 55 Pac. 225–229, the court, speaking of the instance where the noise of a wagon over hard streets, more or less rocky, would interfere with the sense of hearing, said:

"Ordinary care required that he stop the noise by stopping the wagon when he was near enough to the track to determine by listening whether there was danger or not. It is true the evidence indicates that his team was brought to a walk; but, notwithstanding this, the noise from the wagon and horses' feet was necessarily sufficient to interfere with the effective use of the sense of hearing. If they had been brought to a full stop, there would have been no disturbing sound which the plaintiff could control; and, under the circumstances, we think he was bound to exhaust this source of information."

This court in Denver City Tramway Co. v. Norton, 141 Fed. 599, 607, 608, 73 C. C. A. 1, speaking to the instance where the view of

159 F.—2

an approaching street car was obstructed, said that the "general rule in respect of the driver of a vehicle in approaching a railroad crossing —a known place of danger—requires that he should stop and listen where his view is cut off." We are mindful of what is said by the Supreme Court in Grand Trunk Railway Company v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, respecting the duty of a traveler to stop before driving upon a railroad crossing. The question before the court in that case was predicated of an instruction asked by defendant below, which it was held was properly refused because it confined the consideration of the jury to a few particular enumerated circumstances and excluded others of equal importance.

The facts in the case at bar were palpable and undisputed. On them the law pronounced the judgment without any finding of fact by the jury. The case presented by the evidence is one where it is admitted in argument of counsel that the signals required by the statute to be given would not, probably, have reached the plaintiff, because of the obstruction of a bluff nearly 200 feet in height and extending back some distance, with the wind blowing in such direction as rather to have taken the sound away from the ears of the travelers, with no view of an approaching engine until within some 30-odd feet of the track to have afforded them any reasonable opportunity to avoid a collision if a train was at hand; they approached the point in a trot to within 20 or 25 feet of the track, and, without stopping, walked immediately into the hazard rather than lose 3 or 4 seconds of time, when and where, without alighting from the vehicle, they would have seen the train coming over 200 feet away, and thus have avoided the accident.

The final contention on behalf of the plaintiff is that he cannot be held to have been guilty of contributory negligence, for the reason that the conveyance belonged to Pfeutze, and was being driven by him. Reliance for this position is based principally upon the case of Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652. In that case it was held that a person who hires a hack and gives the driver directions as to his destination, and exercises no other control over the conduct of the driver, is not responsible for his acts of negligence, or prevented from recovering against the railroad company for injuries suffered in a collision of the hack with a train, caused by the concurring negligence of the managers of the train and of the driver. This is based upon the proposition that such a hack driver is not the agent of the passenger, over whose conduct and action he has no right of control, and whom he does not undertake to direct. In the case at bar the plaintiff did not hire the conveyance and the driver to carry him to his destination; but they were traveling together in companionship in Pfeutze's vehicle on a mission of mutual interest, the plaintiff having as much right as Pfeutze to direct their course. Under the facts of this case, the relation that plaintiff sustained to his companion, Pfeutze, did not permit him to sit dumb and inert in the vehicle, taking no heed of a known danger, permitting Pfeutze to drive him into a pitfall or onto a deadly railroad track, implicitly trusting his life and limbs to the discretion of his companion, without a word of warning or protest. It is now the better recognized rule of law that as to such a person

situated as was the plaintiff, riding in a vehicle in mere companionship with his friend, engaged upon a mutual adventure, it is as much his duty as that of the driver to take observation of dangers, and to avoid them, if practicable, by suggestion and protest. In other words, he is required to exercise ordinary care to avoid injury. As said by the Supreme Court of New York in Brickell v. N. Y. C. & H. R. Co., 120 N. Y. 290-294, 24 N. E. 449, 450, 17 Am. St. Rep. 648:

"The rule that the driver's negligence may not be imputed to the plaintiff should have no application to this case. Such rule is only applicable to cases where the relation of master and servant or principal and agent does not exist, or where the passenger is seated away from the driver by an inclosure, and is without opportunity to discover danger and to inform the driver of it. It is no less the duty of the passenger, where he has the opportunity to do so, than of the driver to learn of danger, and avoid it if practicable."

This is supported by persuasive authority. Whitman v. Fisher, 98 Me. 575, 577, 578, 57 Atl. 895; Township of Crescent v. Anderson, 114 Pa. 643-647, 8 Atl. 379, 60 Am. Rep. 367; Dean v. Penn. Ry. Co., 129 Pa. 514, 525, 18 Atl. 718, 6 L. R. A. 143, 15 Am. St. Rep. 733; Illinois Cent. Ry. Co. v. McLeod, 78 Miss. 334, 341, 29 South. 76, 52 L. R. A. 954, 84 Am. St. Rep. 630; Bresee v. Traction Company, 149 Cal. 131, 85 Pac. 152, 154, 5 L. R. A. (N. S.) 1059; Hoag v. N. Y. Cent. & H. R. R. Co., 111 N. Y. 199, 18 N. E. 648; M., K. & T. Ry. v. Bussey, 66 Kan. 735, 745, 71 Pac. 261; U. P. Ry. Co. v. Adams, 33 Kan. 427-430, 6 Pac. 529; Bressler v. C., R. I. & P. Ry. Co., 74 Kan. 256, 86 Pac. 472. If the law were otherwise, A. and B., having occasion to drive through the country on a matter of mutual business or pleasure, riding in a conveyance owned by A., who should drive, their course of travel leading across a railroad track, the situation of the intersection being very dangerous on account of it being "a blind crossing," with which A., the driver, was not familiar, but B. having full knowledge of such danger, he could sit in his seat and suffer A., without a word of warning or suggestion, to drive into the death trap, and if injured himself, when charged with contributory negligence, say, as A. was not his servant or agent he was not responsible for A. driving heedlessly onto the track. The law of common sense applied to such a situation is that the movement and control of the vehicle is as much under the direction and control of one as of the other.

Under the facts of this record the Circuit Court should stand justified in directing a verdict for the defendant. The judgment is affirmed.