## ENGSTROM v. CANADIAN NORTHERN RY. CO.

(Circuit Court of Appeals, Eighth Circuit. April 11, 1924. Rehearing Denied June 18, 1924.) .

No. 6324.

1. **Railroads ☜327(12)—Passenger in conveyance approaching crossing bound to use reasonable care.**

   A passenger who is not operating or controlling a conveyance is bound to use reasonable care to avoid injury from collision of that conveyance with a train at a crossing.

2. **Railroads ☜334—Sudden danger element of negligence of traveler.**

   The sudden presence of imminent danger is an element in determining negligence of passenger in conveyance approaching crossing.

3. **Railroads ☜350(8, 21)—Negligence and contributory negligence held questions for jury.**

   In an action for death of passenger in an automobile, *held* that, in view of testimony, of the previous invitation to cross, and of the imminence of the danger when the warning was given, it could not be said, as matter of law, that deceased was negligent, but that question, and the question of defendant's negligence in backing the train without timely warning, were for the jury.

In Error to the District Court of the United States for the District of Minnesota; Andrew Miller, Judge.

Action at law by Ole Engstrom, administrator of the Estate of Andrew Anderson, deceased, against the Canadian Northern Railway Company.

On rehearing. Former opinion (291 Fed. 736) reversed in part, and judgment below reversed.

F. A. Grady, of Crookston, Minn. (Alexander Fosmark, of Crookston, Minn., on the brief), for plaintiff in error.

Arnold L. Guesmer, of Minneapolis, Minn. (Hector Baxter and Brown & Guesmer, all of Minneapolis, Minn., on the brief), for defendant in error.

Before STONE and KENYON, Circuit Judges, and TRIEBER, District Judge.

STONE, Circuit Judge. This writ of error was determined, by the judges now sitting, at the last May term. The judgment was then affirmed on the ground that contributory negligence was established. A rehearing was granted and the case has been reargued.

This is an action by an administrator for death through collision between an automobile and moving railroad cars. At the close of all the testimony, a verdict was directed for the defendant. From the judgment thereon, this writ is sued out. Two main questions are here presented:

(1) Did the court err in denying the motion to remand the cause to the state court?

(2) Did the court err in directing a verdict for the defendant?

## I.

We are satisfied with the result and reasons as set forth in the previous opinion upon this point.

## II.

The argument made at the former hearing and now is that there was evidence of negligence on the part of defendant which justified submission of that issue to the jury, and that contributory negligence was not shown so conclusively as to withdraw that issue from the jury. Our former decision was that contributory negligence was so conclusively shown that the trial court rightly instructed a verdict for defendant. It was doubt as to the accuracy of our determination upon this point that caused us to grant the rehearing. Again we have painstakingly gone through all of the evidence, much of it more than once. This we have done with the purpose of ascertaining whether all of the substantial testimony supported the claim that the deceased was guilty of contributory negligence. We are convinced that our former view of this matter was unsound. We are not concerned with the weight of the evidence but with the presence of any substantial testimony which would tend to negative the presence of contributory negligence.

[1, 2] In this jurisdiction it is established doctrine that a passenger, who is not controlling or operating the conveyance, is bound to use reasonable care to avoid injury from collision of that conveyance with a train at a crossing. Bradley v. Mo. Pacific R. Co. (C. C. A.) 288 Fed. 484; Rebillard v. Railway Co., 216 Fed. 503, 133 C. C. A. 9, L. R. A. 1915B, 953. What will constitute such negligence depends, of course, upon the circumstances of each case. The doctrine that the sudden presence of imminent danger is an element in determining negligence has been applied by this court to such passenger. Davis v. Railway Co., 159 Fed. 10, 88 C. C. A. 488, 16 L. R. A. (N. S.) 424. With these legal rules in mind we turn to the substantial evidence most favorable to plaintiff.

[3] In the village of Warroad, Minn., defendant's track crosses Lake street, which is the main street. That street runs approximately east and west. The track crosses the street at a right angle. The accident occurred early in the afternoon of a clear day. An engine on the south end of a string of cars was switching them on to several tracks branching off north of the street. These operations required passage of the train back and forth over this crossing. Very shortly before the accident the train moved slowly south over the crossing and stopped with the rear end of the last car about at the sidewalk on the south side of the street. While it was moving southward over the street, an automobile came up from the west and stopped about 40 feet from the track. Very soon afterwards and while the crossing was still blocked by the train, a second automobile came up and stopped about a rod back of the first one. While they were standing there the Anderson automobile, in which deceased was riding, drove up and stopped about 58 feet back of the second automobile. A brakeman, apparently in charge of the rear of the train and standing on the south side of the street just east of the track (near the rear end of the train), signaled for the automobiles to cross. The first and second did so

with safety. The stop of the Anderson automobile west of the crossing was momentary and it then followed the other automobiles. Without warning or appreciable noise the train began to back and the collision took place. It is beyond dispute that Anderson and deceased could have seen the train moving south over the crossing and then stopped. This is true because they were proceeding toward that crossing and having it plainly in sight for about 400 feet before they halted behind the other automobiles. As both Anderson and deceased were killed we cannot know what they actually observed, but there is no reason to believe that they were not doing the natural and usual thing of looking ahead of them toward the crossing and it is, therefore, a proper inference that they observed the signal to cross given by the brakeman. Only 58 feet back of the second automobile, it would be natural for them to interpret the signal as meant for all of the three automobiles thus lined up awaiting an opportunity to cross. As reasonable men they might proceed with the idea that they had nothing to fear from that train. We do not mean that this invitation to cross would release them from all obligation of care and watchfulness but we do mean that there was but a single track across this street; that such track was occupied by a switching train; that they knew there could be no danger except from that train; that the person apparently in charge of that train had assured them they could cross safely. All of these considerations would lessen the apparent reason for watchfulness. This state of mind, induced by defendant, is an important element bearing upon the care required from these two men. It might not be negligence for them to act upon the signal and attempt to cross. Both Mrs. Moody (who was in the Anderson machine) and Mr. Craig (who was standing near the east side of the crossing on the north side of the street) testified that the train made no noise when it backed up. As it was only slightly over 40 feet from where some witnesses place the rear end of the train, when it was standing, to the center of the street, the train might have approached very near the point of collision very soon and without attracting the attention of the occupants of the machine until it was fairly onto them. But this is not all of the picture. The evidence is clear that at some time after the train had started backing this brakeman shouted a warning to the Anderson automobile and endeavored to avert the catastrophe. If this was done in time for deceased, in the exercise of ordinary care under the attendant circumstances, to have avoided injury, he was negligent if he failed to do so. Testimony as to how near the Anderson machine was to the track when this warning was given is contradictory as might be expected. In the suddenness and horror of the occurrence, it is but natural that witnesses would differ. It is our duty to consider that which is most favorable to plaintiff. Mrs. Stern who was walking in Lake street a short distance east of the crossing heard shouts and "immediately" turned. She then proceeds:

"And when you got about half way between the spur and the old garage on the south side of Lake street what happened? A. I heard shouts.

"Q. And about how far were you then, if you can tell me, from the crossing, if you know? A. Well, I don't know positively.

"Q. No, not to the foot, but you can tell me pretty close, you have an idea? A. Well, I suppose 60 or 70 feet, somewhere in there.

"Q. About 70 feet? A. Possibly.

- "Q. Now the first thing you heard that attracted your attention at all was a man hollering? A. I think there was more than one because shouts came from both sides of the street.

"Q. Well you did hear one man holler? A. I heard more than one voice.

"Q. And they were loud were they? A. Very loud.

"Q. And what did you do when you heard that hollering? A. I immediately turned to see what was going to happen.

"Q. Well now can you give us some idea how quickly you did turn? A. I turned on the instant, just as quick as I could turn.

"Q. Just on an instant, and when you turned after hearing that hollering, you looked back towards the railroad crossing, didn't you? A. I did.

"Q. What did you see? A. I saw the Engstrom car coming up the rise and I saw the railroad train slowly, backing.

"Q. And how far were they apart? A. Well in my estimation there was about 8 feet between the west or the northwest corner of the freight car and the corner of the automobile, that is the engine, the radiator.

"Q. And that was the location of the north end of that train and the automobile immediately after you made the turn to look? A. Immediately after I made the turn to look.

"Q. And you turned immediately upon hearing the first holler, is that true? A. Yes, that is true.

"Q. And you now say that the car, the automobile and the train in your opinion were about 8 feet apart? A. That is the way it appeared to me."

Mrs. Moody, who was riding in the rear seat of the Anderson machine, testified:

"Q. How far were you from the brakeman when you heard him holler? A. I imagine somewhere about 18 or 20 feet is what I—

"Q. Well, now let me see, the brakeman was off to the right-hand side as you were going east? A. Yes, sir.

"Q. You were sitting in the back seat? A. Yes, sir.

"Q. How far would it be from the front of the car to the brakeman? A. That would be awfully close, I couldn't say about, I wouldn't imagine it would be over 10 feet.

"Q. Ten feet that was when you heard the holler? A. Yes, sir.

"Q. And was that the time when you saw him motion his hand? A. Yes, sir.

"Q. Did you see him motion his hand or holler before the front of the car was about 10 feet from where the brakeman was at any time prior to that? A. No, sir.

"Q. How many times did the brakeman holler? A. He just gave a yell and waved his hand, just yelled like.

"Q. That was the only time he hollered was it? A. Yes, sir.

"Q. And it was the only time you saw him wave his hand? A. Yes, sir."

Mr. Marvin, called for defendant, who was seated in an office on the west side of the crossing and north side of Lake street about 228 feet from the crossing testified:

"Q. And after he came in did he at any time call your attention to anything? A. He was sitting on the opposite side of the desk talking about some matters and all of a sudden he jumps up and he says, 'Look out there, something is going to happen,' or something like that, made some remark, and I turned around in my swivel chair and looked out of the window.

"Q. And when you looked out of the window what did you see? A. I saw the automobile and the train going together.

"Q. Now before you swung around there did you hear any shouting outside? A. About the time Mr. Brown drew my attention I heard some hollering outside."

On cross-examination he testified:

"Q. When Mr. Brown made the exclamation to you which you testified to, you state to the jury whether you turned immediately and looked? A. I did.

"Q. As quick as you could turn on the chair? A. As quick as I could.

"Q. Was that instantly?

"Mr. Guesmer: Objected to as repetition; he has already answered.

"The Court: He may answer.

"A. As quick as I could.

"Q. And your attention was immediately attracted to the railroad crossing, wasn't it? A. Yes, as soon as I turned I was focused on the railroad crossing.

"Q. And from the time that you focused your eyes on that railroad crossing how far was that automobile and the rear end of that train apart? A. Just about together.

"Q. Just about together? A. Yes.

"Q. Brown had called your attention to what he had seen and given you this explanation before you heard any hollering? A. My recollection is that it was all about the same time.

"Q. All about the same time? A. Yes, sir.

"Q. And after you heard the holler, after Brown called your attention, the crash came just about that quick, didn't it?

"Mr. Guesmer: Objected to as—

"The Court: Sustained.

"Q. Give us some idea how long after your attention was called there, Mr. Marvin? A. I was sitting in a swivel chair on this side (indicating) and Mr. Brown was sitting on that corner, half standing, and after awhile he makes some exclamation, 'My God! what is going to happen!' I cannot just recall the words, he was looking past me out the window, and I just swung around in my chair and looked out of the window at the crossing and they had not got quite together.

"Q. Well, then they had not yet come together? A. As near as I can describe it, it would be almost the point of contact, there was no crash.

"Q. There was no crash? A. Not at that time, I saw the first turn of the car, the automobile.

"Q. And can you give the jury some idea in seconds, or length of time from the time you saw it until the collision had occurred? A. Well, it was very, very short, perhaps 10 or 15 seconds."

Mr. Milligan, an employee of defendant, on cross-examination testified:

"Q. Immediately upon O'Donnell's hollering you turned and looked, didn't you? A. Yes, sir.

"Q. Just the instant you heard him holler, is that true? A. Yes, sir.

"Q. Now when you turned and looked, the instant that you heard him holler, how far was that automobile from that train? A. Well, I stated it was coming up the rise.

"Q. How far was it? A. About 40 feet probably.

"Q. Then was this question asked you at the trial of the Nels Engstrom case, 'Did you throw the switch, referring to the north switch, before you looked back?' Do you remember that question being asked you?

"Mr. Guesmer: Objected to as not proper cross-examination, nothing in conflict with what he said here; he said here it was before he looked back; he said that already right here now he threw it before he looked back.

"Mr. Grady: This is a preliminary question.

"The Court: Overruled.

"Q. Do you remember that question being asked, Mr. Milligan? A. Yes.

"Q. Did you answer that question, 'I did'? A. I must have answered it; you got it down there.

"Q. Then was this question asked you, 'Just about the time you threw that switch you first heard the holler;' was that question asked you? A. Yes.

"Q. And did you reply 'Well somewheres right about that time'? A. Yes, sir.

"Q. That is true, is it? A. Yes, sir.

"Q. Then was this question asked you, 'Did you immediately turn to see what was the matter?'

"Mr. Guesmer: Objected to as not at all in conflict with anything he said here.

"The Court: I don't think that you are bringing any particular thing up to impeach him with.

"Mr. Grady: I will just drop down just a little bit further then, counsel is so finicky about it.

"Q. Then you turned, following up the questions that I have asked you 'turned and how far from the railroad crossing was this automobile then'; was that question asked you? A. I think it was.

"Q. And did you say 'Well, it was getting very close'? A. Yes.

"Q. Did you? A. Yes.

"Q. Then was this question asked you, 'About five feet,' was that question asked you? A. Yes.

"Q. And did you answer, 'I should judge it would be about ten feet, probably somewheres around ten or twelve feet,' was that your answer? A. Yes, sir, must have been.

"Q. Was this question then asked you, 'It might have been a little less than that;' was that question asked you? A. Yes, sir.

"Q. And did you answer 'It might have been a little less or a little more'? A. Yes, sir.

"Q. Then was this question asked you, 'This car was going along at about what gait then,' was that question asked you? A. Yes, it was asked me.

"Q. And did you answer 'Well I thought it was going to come to a stop.'? A. Yes.

"Q. Then was this question asked, 'But now about how fast was it going;' was that question asked you? A. Yes.

"Q. And your answer 'Oh, I wouldn't want to say how fast that car was going'? A. Yes.

"Q. The next question is, 'Six or seven miles an hour;' was that question asked you? A. Yes.

"Q. And did you reply 'It was going very slow'? A. Yes.

"Q. Then was this question asked you, 'Which was moving the fastest, the train or the automobile;' remember that question being asked? A. Yes, sir.

"Q. And did you answer 'They were just about coming along about so'? A. Yes.

"Q. Then was this question asked you, 'When you saw them there how far was the rear end of the train from the automobile?' A. Yes, sir.

"Q. And did you answer 'It is pretty hard to state you know'? A. Yes, sir.

"Q. Then was this question asked you, 'Give us your best judgment on that,' and did you answer 'Well they were pulling together'? A. Yes.

"Mr. Guesmer: And let it show there was an interruption thereto, the record shows that.

"Mr. Grady: It shows a small dash.

"Q. 'Your judgment would be that they were about five or six feet apart,' was that question asked? A. Yes, sir.

"Q. And did you answer 'Yes, something, probably further than that'? A. Yes, sir.

"Q. Then did I ask this question, 'About how far,' and you reply 'I should judge about eight feet'? A. Yes, sir.

"Q. And that was the time that you heard O'Donnel holler? A. Not at that time.

"Q. Not at that time, well we will go on and see. A. I don't think it states in that record.

"Q. Just a minute, 'and that was the approximate position of the automobile and the rear end of this cattle car of the train when this holler was given,' was that question asked you? A. Yes.

"Q. Then did you say in reply, 'Well I can't say just at that time at the time of the holler, it all took place so suddenly, I looked and then everything was in a jumble'? A. Yes, that is right.

"Q. Then was this question asked you, 'After that holler you turned imme-diately and looked?' A. Yes, sir.

"Q. And did you answer 'Yes'? A. Yes.

"Q. And then did I not ask you then the next question, 'Instantly?' A. Yes.

"Q. And did you not reply 'Yes'? A. Yes."

If the jury should believe the evidence above quoted they might well conclude that the train and automobile were within 8 or 10 feet of each other and both moving together when this warning came. Prac-tically instantaneous action would have been required to stop the ma-chine or to have escaped from the machine. We cannot say that de-ceased, who was not driving the machine, was, as matter of law, neg-ligent because he neither stopped the machine nor escaped from it. He acted in the face of sudden, imminent and great danger.

In our former opinion, it was unnecessary to determine the point as to whether there was substantial evidence of negligence on the part of defendant which should be submitted to the jury. The trial court based its peremptory charge upon lack of substantial evidence of such negligence. We think the court erred.

From the above statements of the evidence, the jury might have con-cluded that the occupants of the Anderson machine were justified in relying upon the signal of the brakeman to cross. If this be true, and considering the proximity of the machine to the crossing and the near-ness of the rear end of the train to the street, we cannot say, as matter of law, that it was not negligence to back the train without first giving timely and adequate warning nor can we so say that the warning given was timely and adequate.

With instructions for a new trial, the case is reversed.