J. W. KIMBROUGH v. WALKER D. HINES, DIRECTOR GENERAL OF RAILROADS, AND ATLANTIC COAST LINE RAILWAY COMPANY.

(Filed 10 November, 1920.)

**1. Instructions—Conflicting Charge—Appeal and Error—Reversible Error.**

When the trial judge erroneously instructs the jury on the issue of contributory negligence, under conflicting evidence, as to the duty of one driving upon a railroad track, at a street crossing in a town, to stop, as well as to look and listen for an approaching train, the error is not cured by a correct but conflicting instruction thereon, in another part of the charge, as the jury will not be presumed to know which of these conflicting instructions is the correct principle of law applicable to the evidence.

**2. Railroads— Crossings— Collisions— Negligence — Contributory Negligence—Instructions—Appeal and Error—Reversible Error.**

Where, upon the trial of an action against a railroad company to recover damages for a personal injury sustained by one driving upon a railroad track at a street crossing in a town, there is evidence tending to show that the view of the plaintiff was obstructed by box cars the defendant had permitted to remain on spur or lateral tracks at the crossing; that the plaintiff knew of the frequent passing of trains at this place, and the train causing the injury approached without sounding its whistle or ringing its bell, and the plaintiff was prevented from seeing the train approach by the intervening box cars, or hearing it by reason of the noise of the running engine of his automobile, and that he did not come to a full stop before going on the track, but, not hearing or seeing the train, he increased the speed of his automobile, and was immediately struck upon passing the end of a box car, which would not have happened had he stopped his machine to investigate: *Held*, an instruction to answer the issue as to contributory negligence in the negative, if the plaintiff looked and listened before entering upon the track, under the circumstances, without reference to the law relating to his not stopping to ascertain the danger, is reversible error.

BROWN, J., concurring in result; CLARK, C. J., and ALLEN, J., dissenting.

APPEAL by defendant from *Daniels, J.*, at March Term, 1920, of WAKE.

Plaintiff brought this action to recover damages for personal injuries sustained at Selma, N. C., 27 January, 1919, as the result of a collision at a public crossing between the automobile which he was driving and a train on the track of the Atlantic Coast Line Railroad Company, which was being operated by the United States Railway Administration. There was testimony on behalf of plaintiff that the train was running at a speed of thirty or forty miles an hour; that no signal of approach to the crossing was given by whistle or bell; that the view of the track was cut off by a string of cars on a spur track, and that these cars extended two or three feet into the public road. Plaintiff testified that

he looked and could not see down the track in the direction from which the train was coming because his view was obstructed by the cars on the spur track.

There was testimony on behalf of defendant that the cars on the spur track did not obstruct the plaintiff's view of the train; that notice of the approach of the train had been given by blowing the whistle and ringing the bell, and that the speed of the train did not exceed ten or twelve miles an hour.

The defendants pleaded the plaintiff's contributory negligence as a defense, and contended at the trial that the failure of the plaintiff to stop before entering upon the track, when it was his duty to do so, was the proximate cause of his injury.

There was evidence that plaintiff was familiar with the crossing, having passed over it on the morning of the accident on his way from Raleigh to Pine Level. He knew that he was approaching a crossing, and says he slowed down. In describing the condition at the crossing and the circumstances of the accident, he says: "There were eight or ten box cars on the track connecting the Coast Line and Southern Railways; the doors of the box cars were closed, and I could not see through them. The first box car was on the crossing two or three feet. I had to turn my car to get around it. There were some eight or ten cars back on the connecting track that prevented me from seeing the train coming toward the crossing from the South, and I came along up to the crossing and slowed the car down and did not hear anything, and just as I passed the car the engine struck me and carried me down the track. I listened for the train. I could not see the track at any point to the south. I did not hear the whistle blow and there was no sound of bell. I listened and looked all I could. I thought there might be a shifting engine going by. As I came toward the track at Selma that morning I looked for the train and could not see it; the box cars prevented it. I could not see south on account of the box cars. I just looked right in the box cars; that was all there was to look at. That was all that I could see until I got right down on the railroad track; I was looking right at the cars, and I had to come around the edge of the box cars and they projected out two feet in the road; the box cars were within four or five feet of the main line of the Atlantic Coast Line. I knew that trains moved north and south at that point. Through passenger trains passed on that track. I drove around the edge of the box cars. When I got around the end of the box cars my front wheel was on the track the train was on; I did not stop; I just slowed up and listened. I did not get out and go to the edge of the box cars and look. I did not stop to see if anything was coming from behind the box cars. I just slowed up, and when I did not hear anything I just pulled through; when I

decided to pull through I speeded up; I did not stop to look around the edge to see if anything was coming. I did not stop anywhere after I came by the Union Fertilizer Company; I just slowed up and listened just about as slow as a car would go and not stop, and I did not hear anything; when you stop a Ford automobile the engine still runs unless you choke it; I slowed down just enough to keep from choking; they cannot chug away pretty heavy in that condition; my engine was running; I did not cut it off; I did not have plenty of time to cut it off behind those box cars; I listened for the train coming with the Ford engine running under my feet; you could not hear the Ford engine 30 yards away; it was running as smooth as a Cadillac; the Ford had been running a year or two, and had just been overhauled; it was not a second-hand car; I had been running it since August; I have no idea how far I had run the car; I expect I would run about 250 miles per week; I had run this car about 5,000 miles. A man ran it before when he traveled for Swift & Company. I should think he made about the same miles as I did. I do not know how long Swift & Company had had the Ford; some one said they had it about a year."

D. T. Oliver, witness for plaintiff, testified: "If Mr. Kimbrough had stopped before he got to the crossing, the train would have gone on by and not hit him."

Richard Britt, witness for plaintiff, testified that plaintiff "was going ten miles per hour. He slowed up just before he got to the crossing and speeded up and went on by."

D. T. Oliver, plaintiff's witness, further testified: "Mr. Kimbrough was going about ten miles an hour at the crossing. He was running about as slow as a Ford would go. He kept on running that way until the train hit him. He slowed up from what he was doing possibly. A Ford will not run any less than ten miles an hour."

Defendant contends that this testimony on behalf of plaintiff, construed in the light most favorable to him, establishes the fact that if he had exercised ordinary care under the circumstances he would have stopped before entering upon the track, and the accident would not have occurred.

In addition to the reasons above set forth, the Atlantic Coast Line Railroad Company and its codefendant contended that the motion to nonsuit should have been granted upon the ground that the record fails to show that this company was in any way connected with the control or operation of its line of railroad at the time of the accident.

Defendants contended that the court not only failed to give the jury appropriate instructions as to plaintiff's duty to stop, or take other precaution for his safety, or, in other words, to exercise due care, besides looking and listening, but if the judge did so he gave another instruction

in conflict with it, when he told the jury that if he looked and listened only, they should answer the second issue "No." And that if he had listened, and the company failed to give him proper warning of the approach of the train, it cannot be imputed to him as negligence that he went on the track. Defendants further contended that the instructions on the issue of contributory negligence are erroneous, because they withdraw the question of plaintiff's duty to do more than this, if necessary, from the jury's consideration, and directed the jury to find that plaintiff was not guilty of contributory negligence if he only looked and listened.

The trial judge gave the following instructions on the issue of contributory negligence: "Upon this issue the burden shifts, and it is upon the defendant to satisfy you by the greater weight of the evidence of the truth of their contention, and the defendant alleges that the proximate cause of the plaintiff's injury was his own failure to exercise care and prudence for his own safety; that as he approached this railroad track at the crossing, the track being a warning of danger, it was his duty to look and listen for the approaching of a train, and the defendant alleges that he failed to exercise care and to perform this duty, and that his failure was the real, or proximate cause of the injury. Now, if this evidence satisfies you by its greater weight that as he approached the zone of danger he failed to look and listen, and that if he did look and listen he could either have seen the train or heard the signal, and that under these circumstances he ventured upon the track, then you should answer this fifth issue 'Yes,' because he would be guilty of contributory negligence, which would exist and extend up to the time of the injury, and would be the proximate cause of it. Unless you are so satisfied, you will answer this issue 'No.' Where the view is obstructed, a traveler may ordinarily rely upon his sense of hearing, and if he does listen and is induced to go on the track, then the failure of the company to warn the traveler of danger cannot be imputed to his contributory negligence. Unless you are satisfied by the greater weight of the evidence, the burden being upon the defendant under this issue, that the plaintiff failed to exercise the care and prudence that the law required of him, as I have indicated to you, then you would answer this issue 'No,' or, if the evidence leaves your mind in such condition that you cannot say how it is, then you will answer it 'No,' because the burden is upon the defendant to satisfy you affirmatively that the plaintiff was negligent, and that his negligence was the proximate cause of his injury."

Defendants contended that by the instructions of the court, which are set out above, the jury were directed to answer the issue of contributory negligence "No," if they found that the plaintiff, as he approached the crossing, merely looked and listened, and the principle that, under the

exceptional circumstances which the jury were fully justified in finding to exist in this case, it was plaintiff's duty to stop, look, and listen, was entirely ignored. In other words, if the jury should find from the evidence and by its greater weight, the burden being on defendant, that for a distance of several hundred feet the view of defendant's track to the south was cut off by box cars; that the cars extended two or three feet into the public road; that plaintiff being fully aware that he was approaching a crossing, was driving at a speed of ten miles an hour; that the automobile which he was driving could not be driven at less than ten miles an hour; that as he approached the crossing he drove around the cars and immediately after passing the cars his automobile was upon the track on which the train was approaching; that he did not hear the train and could not see whether a train was approaching until he was on the track; that as he listened for a train the engine of his automobile immediately in front of him was running with the noise usually incident to the operation of a gasoline engine, and the jury should find that under such circumstances a prudent man would have stopped his automobile and his engine before driving beyond the box cars and onto the track, then it would be the duty of the jury to answer the issue of contributory negligence "Yes," it having been admitted by plaintiff that he did not stop, and the uncontradicted evidence of plaintiff's witnesses having established the fact that if he had stopped the accident would not have happened.

There was a verdict for the plaintiff, with damages assessed at $20,000. Defendants reserved exceptions, and appealed.

*J. M. Broughton and Douglass & Douglass for plaintiff.*
*Murray Allen for defendants.*

WALKER, J., after stating the essential facts of the case: The defendants contend that the instruction covered by their exception No. 28, which was taken to the instruction of the court to the jury, was erroneous, and agreed that it is especially objectionable because by it the jury were told that if the plaintiff looked and listened, and did no more, before entering upon the crossing and the track, they should answer the issue as to contributory negligence "No." We will not discuss the question whether other instructions on this phase of the case were given which were, in themselves, correct, because, even if they were, the other one was erroneous, and in conflict with them. The rule of this Court upon such a question is thoroughly well settled by our decisions. Where such a conflict occurs, a new trial is granted, because the jury are not competent, as we have often said, to decide which instruction is correct, or which is incorrect. We find this rule thus stated in *Edwards v. R. R.*,

132 N. C., 99, where the leading authorities are cited: "The fact that the court, in one part of the charge, told the jury that it is the duty of an engineer, when approaching a crossing, to ring the bell or blow the whistle, did not cure the error he committed in the respect already indicated, that he must ring the bell and sound the whistle. It is well settled that when there are conflicting instructions upon a material point a new trial must be granted, as the jury are not supposed to be able to determine when the judge states the law correctly and when incorrectly. We must assume, in passing upon the motion for a new trial, that the jury were influenced in coming to a verdict by that portion of the charge which was erroneous." Other cases are, *S. v. Barrett,* 132 N. C., 1010; *Tillett v. R. R.,* 115 N. C., 662, and *Williams v. Haid,* 118 N. C., 481.

The court charged the jury that it was sufficient in law if the plaintiff "looked and listened," without doing anything more, and if the jury found that he did, they should answer the second issue, as to contributory negligence, in the negative. This instruction was erroneous, because that it is not all that is required of the plaintiff, but in addition thereto he must further do what a man of ordinary prudence would have done, as, for instance, stopped his car (if the jury would have found that a man of ordinary prudence would have done so), under the same or substantially similar circumstances, to save himself from injury. So that the instruction fell short of the full measure of plaintiff's duty under circumstances which the jury could have found to exist, and this is true, although the jury should find that one of the defendant's engineers, who was at the time in control of the engine, had failed to give the proper signal.

The rule thus stated was the one adopted in *Cooper v. R. R.,* 140 N. C., 209. Even though the plaintiff looked and listened, the jury may have found that the situation was such as to require him to do more, even to stopping his car, as a man of ordinary prudence would have done in like circumstances, or they may have found, by using their common sense and observation, that, notwithstanding what the plaintiff says as to the noise of his car, his ability to hear was so diminished by the noise of the same as to make it imperative that he should stop it, so that he might hear either the noise of the train as it approached nearer and nearer, or the sound of its signal. The jury could have arrived at this conclusion if they accepted the defendant's evidence as true, that the proper signals were given, and there was no reason why the plaintiff should not have heard them and prevented injury to himself, unless his hearing was deadened by his own fault in not stopping his car. And they could also have found that no man of ordinary prudence would venture on the track under the circumstances without assuring himself of the fact that the train, then expected and behind its schedule time,

was not actually coming at that time and near the crossing, or that some shifting engine was about to pass over the crossing, as he testified: "I thought there might be a shifting engine about to pass." Again he stated, "I just slowed up, and when I did not hear anything I just pulled through; when I decided to pull through I speeded up; I did not stop to look around the edge to see if anything was coming. I did not stop anywhere after I came by the Union Fertilizer Company.". The jury may have found from this testimony, taken with some other facts, that a man of ordinary prudence would have looked around the edge of the box cars, which were five feet from the track, to see if a switching engine or train was coming, and that it was negligence, tested by the rule of the prudent man, not only not to do this, but to "speed up" when he decided to "pull through." There are, perhaps, other combinations of facts which the jury may have found to exist, and from which the jury, by applying the rule just mentioned, may have inferred that plaintiff's conduct was imprudent, if not very risky, and was not that of the ideally discreet and careful man. The instruction was wrong in itself, inherently so, and if there was a correct one, it was in conflict with it, and left the jury in ignorance of the true principle of law which should govern them in finding a verdict, or, at least, in a state of utter confusion as to what principle applied to facts as they found them to be. If the instructions were not in conflict, but in perfect harmony, as the last one was erroneous, both were wrong, which required the case to be referred to another jury.

In *Shepard v. R. R.,* 166 N. C., 539, it was said by *Justice Hoke,* citing many cases, and among them *Cooper's case, supra:* ."It is also established by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing; but 'whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury,' " citing *Judson v. R. R.,* 158 N. Y., 597; *Malott's case,* 159 Ind., 127-134; 3 Elliott on Railroads (2 ed.), sec. 1095, note 147; 33 Cyc., pp. 1010, 1020. In *Judson's case, supra,* the rule is stated as follows: "A person approaching a railroad crossing is not required, as a matter of law, to stop before attempting to cross, but his omission to do so is a fact for the consideration of the jury." And in *Malott's case, supra:* "Exceptional circumstances may also require him to stop, although this proposition generally presents itself as a mixed question of law and fact." And *Justice Hoke* thus concluded, in *Shepard's case:* "On a careful perusal of the record we are of opinion that the issue of contributory negligence must be referred to the decision of another jury, when the question whether, on the entire facts and circumstances, as the jury may find them to be, the plaintiff was in

the exercise of reasonable care at the time in entering on the crossing *without having come to a full stop."* (Italics ours.)

And yet the court ignored those principles, and omitted important and essential matter from his instruction on the second issue, and confined plaintiff's contributory negligence to the single fact, whether he "looked and listened," with the instruction that if he did to answer the issue "No." When the court undertakes to define what is negligence, it must do so fully, and not leave out any essential element of it, *S. v. Phifer,* 90 N. C., 721, or to state it differently. When the court attempts to charge the law, it must be done correctly. *S. v. Merrick,* 171 N. C., 788, and cases cited, especially *Carleton's case,* 43 Neb., 373, and *Simmons v. Davenport,* 140 N. C., 407.

As to the motion for a nonsuit we will reserve our opinion, as the facts may more fully and definitely appear on the next trial. Defendants may renew their motion at that time without prejudice.

We are, therefore, of the opinion, and so hold, that there was substantial error as pointed out by us, and a new trial is ordered.

New trial.

BROWN, J. While I concur in granting a new trial, I am of opinion the motion to nonsuit should be granted.

It is well settled that where the facts necessary to constitute contributory negligence are established by the evidence of plaintiff, motion for judgment of nonsuit should be sustained. *Keller v. Fiber Co.,* 157 N. C., 575. I think the motion should have been allowed in this case.

Plaintiff testified that he could not see down the track on account of box cars; that he was looking right at the cars, and had to go around the edge of the box cars, as they projected out two feet onto the road crossing. He admits that he knew that many trains passed over the crossing on that track. He admits that he did not stop his automobile, but only slowed down and listened. He distinctly says that he did not get out and go to the edge of the box cars and look, and further states: "I did not stop to see if anything was coming from behind the box cars." This evidence shows such a high degree of carelessness that I do not think, as a matter of law, plaintiff can recover. I am aware of the fact that it is said in *Shepherd v. R. R.,* 166 N. C., 545, that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing; but whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury. The case at bar differs very materially from the *Shepard case.* There is nothing here to go to the jury. The plaintiff's own evidence shows that his conduct was such as cannot be justified in law under the rule of the

prudent man. He admits that his view was obstructed and that he could not see whether a train was coming or not. He did not take the trouble to stop his car and walk to the edge of the box cars and look. His car was running, his engine going, and we know from common experience that under such circumstances he could not hear anything like as well as if his engine had been stopped. Under such conditions, testified to by himself, I think the law made it the imperative duty of the plaintiff to stop his car before going on the track. It must be admitted that if he had done so he would not have been injured.

As far back as 1873, *Judge Sherswood,* an eminent judge of the Supreme Court of Pennsylvania, said: "There never was a more important principle settled than that the failure to stop immediately before crossing a railroad track is not merely evidence of negligence for the jury, but negligence *per se* and a question for the court. It was important not so much to railroad companies as to the traveling public. Collisions of this character have often resulted in the loss of hundreds of valuable lives of passengers on trains, and they will do so again if travelers crossing railroads are not taught their simple duty not to themselves only, but to others." *R. R. v. Beale,* 73 Pa., 503.

"The failure of a person about to cross a railway track, on a highway at grade, to look and listen for an approaching train and to stop for such purpose, where the view of the track is obstructed, or where there is noise which he may control, is negligence *per se,* which will bar a recovery for an injury resulting from a collision with a train at such crossing." *Blackburn v. R. R.,* 34 Orégon, 215, citing numerous cases in support of this position at page 222.

In *Chase v. Maine Central R. R. Co.,* 167 Mass., 383, it is said to be a general rule "that, if there is anything to obstruct the view of a traveler on a highway at a crossing at grade, it is his duty to stop until he can ascertain whether he can cross in safety." The same principle is laid down in *Sholts v. R. R.,* 121 Fed., 678; *R. R. v. Holden,* 93 Mo., 417; *Ely v. R. R.,* 158 Pa., 233. The Supreme Court of Maryland said, in *R. R. v. Hogeland,* 66 Md., 149: "It is negligence *per se* for any person to attempt to cross tracks of a railroad without first looking and listening for approaching trains; and, if the track in both directions is not fully in view in the immediate approach to the point of intersection of the roads, due care would require that the party wishing to cross the railroad track should stop, look, and listen before attempting to cross. Especially is this required where a party is approaching such crossing in a vehicle, the noise from which may prevent the approach of a train being heard. And, if a party neglects these necessary precautions, and receives injury by collision with a passing train, which might have been seen if he had looked, or heard if he had listened, he will be presumed to

have contributed by his own negligence to the occurrence of the accident. This is the established rule, and it is one that the courts ought not to relax, as its enforcement is necessary as well for the safety of those who travel in railroad trains as those who travel on the common highways."

In *Davis v. R. R.,* 159 Fed., 10, it is held: "One who drives on a trot toward a railroad crossing when the view along the track is obstructed, until within 20 or 25 feet of the track, and then continues to walk his horses toward the crossing without taking the precaution to stop and listen for a train, is guilty of negligence which will preclude his holding the railroad company responsible for collision with a train."

In *Shufelt v. R. R.,* 96 Mich., 327, the Court said: "He who does not choose to stop and listen, where he cannot see, must suffer the consequences of his own negligence."

In a later Massachusetts case, *Chase v. R. R.,* 208 Mass., 137, decided since automobiles came in vogue, it appeared that a chauffeur operating a seven-passenger automobile was driving along a country road about noon on a bright day, and as he approached a grade crossing with which he was familiar, and knew that trains might come from either direction at any moment, at a speed from 12 to 15 miles per hour until he was very close to the track, when he reduced his speed to eight miles an hour, and while crossing the track the automobile was struck by a train running 25 miles an hour. The Court held that the driver of the automobile was guilty of contributory negligence as a matter of law, and in the opinion of the Court it is said: "The rules of law applicable to the driver of a horse-drawn vehicle approaching a railroad crossing have been laid down in many cases. He must look and listen in a reasonable way, so as, if possible, to secure his safety. The proper application of this rule for one driving an automobile is simple, and in concrete cases far less difficult than for the driver of horses. As was said in *Hubbard v. Boston & A. R. Co.,* 162 Mass., 132, 'There are very few horses that can safely be stopped within 15 or 20 feet of a railroad track to await the passage of an express train. One driving there before the accident was obliged to choose between the risk of driving across and being struck by an express train whose approach he might fail to hear, and the risk of stopping to look so near the track as to expose him to great danger from the fright of his horse if an approaching train would be near.' The driver of an automobile is in no such danger. If his machine is a good one, it can be controlled easily and perfectly, and there is no danger from it if he stops to look and listen within six feet of the track."

In the *Chase case* the driver of the automobile, Hancock, did not stop, and it was indisputable that had he stopped the injury would not have occurred. In concluding its opinion the Court says: "With proper

care on the part of the driver, there is no danger in crossing a railroad with an automobile upon an ordinary highway in a country town. In this case, considering that part of the testimony most favorable to the plaintiffs, there is no evidence that Hancock was in the exercise of due care; but, on the contrary, the accident seems to have been caused by his great carelessness."

In *R. R. v. Maidment,* 168 Fed., 21, and in *Brommer v. R. R.,* 179 Fed., 577, the Federal Courts hold that it is the imperative duty of the drivers of motor-driven vehicles to stop as well as to look and listen before crossing railroad tracks.

I could cite many other cases from many other Courts holding similar views. They all base them upon the idea that an automobile in good condition can easily be stopped and started, and that no hardship is imposed by requiring them to stop before crossing a railroad track. It is perfectly obvious that by stopping collisions are certainly avoided, injuries prevented, and human lives saved. The use of automobiles has grown immensely in the last decade. Their use involves many dangers not only to the users but to the public as well. The public interest demands that the courts should be rigid and inflexible in requiring those who operate such vehicles to exercise a high degree of care in order to prevent injuries. The statistics show, as I have seen it stated in the public prints, that 126,000 persons were killed by automobiles within the past year, of which 21,000 were children. Such mortality is appalling, and surpasses by far the number of deaths caused by railroads.

I am very strongly of opinion that this Court should align itself with the Courts of other States, some of which I have quoted, and hold that under all circumstances an automobile shall come to a full stop before crossing a railroad track. This is the universal rule established by railroads for the purpose of preventing collisions where one railroad crosses the track of another. An automobile can come to a full stop very much easier and in far less time than a railroad train, and it is no hardship to require it to do so, and it would insure the safety of its occupants as well as those who travel on a train.

In conclusion, I will say that this case is one of many others where the jurors seem ready and willing to take the word of the party injured, who is pecuniarily interested in the result, as against the engineer's and firemen, who have no such interest. In this case the engineer and fireman, men against whose character not a word is uttered, both swear positively that the whistle blew for the crossing, and that they kept a vigilant look. The plaintiff, who expects to recover a large sum of money, does not swear that the whistle did not blow, but only that he did not hear it. Of course he did not with his motor throbbing and his

car crossing the tracks. The engineer could not see him because the plaintiff was behind the box cars and out of the engineer's vision.

There is no way to do justice to all parties and to save life and personal injury except to require those who cross railway tracks in motor cars to stop and look and listen.

. CLARK, C. J., dissenting: It was earnestly contended by counsel for defendant that this Court should hold it to be law that the drivers of all automobiles or other conveyances traveling along a public road shall come to a full stop whenever such road is crossed by a railroad track. This would be to make law, for it has never been so held in this State. This proposition is based upon a misconception, as it seems to me, of the respective rights of the people and the railroads. The public roads of the State belong to the people, and are used by them freely as a part of their sovereignty. Formerly they were the "King's Highway." Now they are the people's highway—the public roads. The railroads, with us, are not owned, as in other countries, by the Government, but by aggregations of individuals for the purpose of private gain. Being useful for the public, they are held to be *quasi*-public corporations, are granted the right of eminent domain to take private property for their use as right of way, and are subject to public regulation as to their conduct and charges. Where they cross the public roads it is in derogation of the right of the public to use these roads, and potentially a serious danger, and, therefore, in all other countries they are forbidden to cross on the same grade, but must make their crossings either above or below the public roads. By force of necessity, in many of our States this has been required by statute to be done by the railroads at their own expense, though it was not enacted when the railroads were built originally.

In this State the Corporation Commission was authorized, in 1907, to require this to be done wherever desirable, C. S., 1048, and the railroads have voluntarily made the change in some few cases where most urgently needed. Where this has not been done, recognition of the superior right of the public to use its own roads requires that whenever the railroad track crosses the public road on the same grade, the railroad company should give the fullest notice by the engineer blowing the whistle and ringing the bell, and by installing electric gongs to warn travelers, and in all much-frequented places (especially places like this, situated in town limits) to have gates and custodians to keep them.

In Germany for 40 years the approach of trains has been announced in railroad stations by electric gongs, operated automatically by the wheels of the engine making an electric circuit as it passes over a device located several hundred yards distant which rings the gong over the annunciator in the station, giving notice as to what train is arriving,

instead of the human voice, as is usual here. The same device is used on some railroads here to give warning at crossings, in addition to signals by whistle and bell. It is an inexcusable disregard of the right of the public to use their own roads for the railroads not to install these electric gongs as a warning at all grade crossings in addition to whistle and bell, —and gates and custodian, where these latter are needed.

In absence of these proper signals, or if there are no gates where the crossing is, as in this case, in a town, or where the travel on the public road is frequent, the liability of the railroad for injury caused by such negligence on the part of the railroad should be conclusive. The right of the people to use their own roads should not be impaired by the negligence of the railroad authorities in not taking the precaution of giving the fullest notice at all crossings, and to establish gates where the track crosses a public road on the same grade where it is much used.

In this State there are over 5,500 miles of railroad tracks and very many times as large a mileage of roads owned by the public, over which latter there passes constantly 150,000 automobiles and motor trucks licensed by the State, besides horse-drawn vehicles many times as numerous, and other conveyances of both kinds from other States. These carry an immense number of persons, and a vast quantity of freight. To require every one of them to come to a full stop every time a driver of any conveyance sees a railroad track crossing a public road would be an incredible inconvenience, and would be in the aggregate, an enormous expense to the public in the aggregate loss of time by reason of the interference with the volume of traffic and travel along the public roads which is vastly greater than that which passes over the railroads. When we consider that the volume of travel and traffic, both on the public roads and railroads is constantly increasing, and that the mileage of both will also grow, a rule that will require all the travel and traffic over the public roads to come to a full stop at the bare sight of a railroad track will be an enormous burden.

This would require stoppage by everybody, all the time, whether a train is approaching or not. But as vehicles pass along the public roads far more frequently than do trains along the railroad tracks, it is a more reasonable rule that the railroads should be required to give notice by signals and, where necessary, by gates, of the approach of one of their dangerous agencies, so that the traffic and travel by the public over their public roads shall not be interrupted, except when absolutely necessary.

The railroads are granted existence by legislation, and are operated for private profit. They have no superiority over roads owned and used by the public, either in dignity or in right. On the contrary, it is incumbent on the railroads, wherever to save expense they persist in crossing the public roads on the same grade, to avoid accidents which

may be inflicted by their engines to give fullest notice of their approach by signals, and in proper places, by lowering gates. In the absence of these the users of public roads should be free to proceed without fear or liability of injury to persons or property from the railroad engine.

At times the railroads have imposed upon the traveling public the inconvenience of a halt of 5 or 10 minutes as a forced tribute of respect on the death of some railroad official whom few of the public had the honor of knowing. This could happen only rarely. Gessler placed his hat upon a pole and compelled the public to pay obeisance to it. But neither of these are more repugnant to our sense of propriety and right than to require the people traveling their own roads to come to a full stop at the sight of two parallel bars of iron laid across the public high-way, simply because the railroads, while saving themselves the expense of avoiding grade crossings, are unwilling to take the trouble or responsibility to give proper signals or to establish gates and custodians wherever needed. At this point, where the railroad track crossed the public road, the latter was a street in the town of Selma, and when the plaintiff reached that point and was not warned by any bars kept by a custodian for the defendant, which should be maintained at such places, nor by any whistle nor by the ringing of any bell or an electric gong by the defendant, and the train was 6 hours behind, and running at a speed, it is claimed, of a mile a minute, it was irrebuttable proof of the negligence of the defendant, and the proximate cause of the injury which was inflicted by its engine upon the plaintiff.

The principle maintained in *Goff v. R. R.,* 179 N. C., 219, and in *Johnson v. R. R.,* 163 N. C., 443, and in all other North Carolina cases was not that every traveler using the public roads must come to a full stop at the sight of a railroad track, but that he "must use his sense of sight and hearing to the best of his ability under the existing and sur-rounding circumstances—he must look and listen in both directions for approaching trains, if not prevented from doing so from the fault of the railroad company." This the plaintiff did according to his uncontra-dicted testimony, and was prevented from seeing the approaching train by the fault of the defendant in obscuring a fuller view by empty cars which were negligently placed by the defendant on a sidetrack obstruct-ing his view. This and the enormous speed of the train which ap-proached, possibly, at a mile a minute, and running 6 hours behind the schedule when no train was expected, and without giving warning, with-out whistle or signal at this crossing of a street which was so much traveled, and in violation of the lawful town ordinance which limited the speed of trains within the town limits, were found by the jury to have been the proximate cause of the injury inflicted on the plaintiff. ·

As has been held by *Allen, J.,* in *Perry v. R. R.,* at this term, quoting from *Johnson v. R. R.:* "If his (the traveler's) view is obstructed or his hearing an approaching train prevented, and especially if this is done by the fault of the defendant, and the company's servants fail to warn him of its approach, and induced by this failure of duty, which has lulled him into security, he attempts to cross the track and is injured, having used his faculties as best he could, under the circumstances, to ascertain if there is any danger ahead, negligence will not be imputed to him, but to the company, its failure to warn him being the proximate cause of any injury he received." *Mesic v. R. R.,* 120 N. C., 490; *Osborne v. R. R.,* 160 N. C., 310.

In *Cooper v. R. R.,* 140 N. C., 221, *Hoke, J.,* said: "Where the view is obstructed, a traveler may ordinarily rely upon his sense of hearing; and if he does listen and is induced to enter upon a public crossing because of the negligent failure of the company to give the ordinary signals, this will usually be attributed to the failure of the company to warn the traveler of the danger, and not be imputed to him for contributory negligence."

In the *Perry case, Judge Allen* thus states the facts which are very similar to this: "The evidence in this case tends to prove that as the plaintiff approached the crossing his view was obstructed by bushes which the defendant permitted to grow on its right of way so high and so close to the track that he could not see until he was on the track; that the plaintiff was traveling from four to five miles an hour; that he looked and listened, and the inference is permissible that if notice of the approach of the train to the crossing had been given that the plaintiff would have heard it, and would not have gone on the track, and if so, the jury was justified in finding that the failure to give notice caused the plaintiff to go on the track, and was the proximate cause of his injury." And, in sustaining the verdict of the jury, held that it could not be declared a matter of law that the failure of the plaintiff to stop was a failure to exercise ordinary care, but was a circumstance to be considered by the jury. In that case, the view was obstructed by the defendant permitting bushes to grow on the right of way; and in this case by the greater negligence of the defendant in shunting a dozen cars which obstructed the view down the track by travelers using the public road.

There are a very few Courts elsewhere who have deemed railroad trains such a deadly instrumentality of injury to the public that as a matter of law it is negligence that defeats a recovery for those using a public road not to come to a full stop at seeing a railroad track across a public road. But this loses sight of the vital fact that the railroads have a right to cross the public roads only *sub modo,* that is, on condi-

tion that they shall use every precaution by giving signals and preserving an unobstructed view for travelers and providing gates with custodian wherever the volume of traffic and travel requires it. It is their duty to make the use of the public roads as safe from injury by them, and to interfere therewith as little, as possible.

So far from holding with these Courts, however, it has been held by us, and cited with approval by *Allen, J.,* in *Perry v. R. R., supra,* and it has been held in other cases (citing *Shepard v. R. R.,* 166 N. C., 545), that "it is not always imperative to come to a complete stop before entering on a railroad crossing; but whether he must stop, in addition to looking and listening, depends upon all the facts and circumstances," which is a question for the jury.

*Judge Allen* further says, pertinently, in the *Perry case:* "The authorities favoring this view proceed upon the idea that the traveler has a right to rely upon the performance of its duty by the defendant, and that when he looks and listens, and neither sees nor hears a train, he has the right to act on the presumption that none is approaching. . . . The sign placed at the crossing, with the warning, 'Stop, look, and listen,' has no other *legal* effect than to call the attention of the plaintiff to the duty imposed upon him by law to exercise ordinary care for his own safety."

In *Perry's case,* as in this, "The evidence of the plaintiff that he might have heard the running of the train if he had stopped was submitted to the jury in support of the defendant's position, and was given the significance to which it was entitled."

I think the verdict and the judgment in this case should be sustained upon the law and the facts.

ALLEN, J., dissenting: The questions raised by this appeal, and particularly the duty imposed upon the traveler as he approaches a railroad crossing with reference to stopping, are fully considered in *Perry v. R. R.,* at this term, and that opinion is a controlling authority on this appeal.

It is true that in a part of the charge the presiding judge made the issue of contributory negligence depend on the failure of the plaintiff to look and listen, when, although he looked and listened, he was also required to exercise the care of one of ordinary prudence, but he also charged the jury that "Omission of the railroad company to give proper warning does not relieve the traveler from looking and listening; in other words, such omission does not discharge the traveler from exercising due care for his own safety. It is the duty of one approaching a railroad to use ordinary and reasonable care to avoid an accident, and to keep a proper lookout for an approaching train, and if he does not

19—180

do so, but goes on and an injury results from such failure, he is guilty of contributory negligence, and under those circumstances it would be your duty to answer the issue 'Yes.' "

Again, after the parts of the charge which are criticised were given and near the conclusion of the charge, on contributory negligence, he said: "I should charge you, gentlemen, as a qualification of what I have already said, that the failure to look and listen as a traveler goes into the zone of danger is of itself contributory negligence, and would justify you in answering that fifth issue 'Yes.' There is a further duty incumbent upon the plaintiff, that is, in respect to conducting himself as a man of ordinary and reasonable prudence, and if this evidence should satisfy you that there was such failure in that respect, and that this failure was the proximate cause of the plaintiff's injury, then you would answer this issue 'Yes.' "

It will be noted that the judge here imposed upon the plaintiff the duty of conducting himself as a man of ordinary and reasonable prudence, and that this was added as a qualification of what he had already said, and under this qualification the jury could, and doubtless did, consider all of the surrounding circumstances, including the failure of the plaintiff to stop.

Upon careful consideration of the whole record, I think the judgment ought to be affirmed.