## CHICAGO AND ERIE RAILROAD COMPANY *v.* LEE, ADMINISTRATOR.

[No. 3,998. Filed June 27, 1902.]

MASTER AND SERVANT.—*Death of Brakeman.*—*Uncovered Switch Wires.* —*Special Findings.*—*Conflict.*—In an action against a railroad company for the death of a brakeman caused by catching his foot in uncovered interlocking switch wires, a general verdict for plaintiff, and a special finding that the brakeman did not know of the existence of the wires, are not overthrown by another finding that the brakeman in the performance of his duties had frequently passed over the wires. *p. 486.*

SAME.—*Death of Brakeman.*—*Uncovered Switch Wires.*—*Assumption of Risk.*—In an action against a railroad company for the death of a brakeman caused by catching his foot in uncovered interlocking switch wires, a general verdict for plaintiff is not overcome by a special finding that the uncovered wires could have been seen at a distance of twenty-five to thirty feet, where it is not shown that such switch wires were in general use on defendant's road, or that the brakeman knew of the location of the wires at the place of the accident. *pp. 486, 487.*

SAME.—*Brakeman.*—*Violation of Rules.*—*Special Findings.*—In an action for the death of a brakeman while fixing a coupling on a moving train, the jury found specially that the accident occurred 180 feet from where the coupling was to be made, and that the rules of the company forbade the brakeman from going in front of a moving train at that point. It was also found that the cars would have slowed down or stopped where the coupling was to be made, but that at the time of the injury the train was slowed down to enable the brakeman to fix the coupling. *Held,* that the special findings did not show the brakeman to be guilty of contributory negligence so as to overthrow a general verdict for plaintiff. *pp. 482, 483, 488.*

HARMLESS ERROR.—*Exclusion of Evidence.*—The erroneous exclusion of evidence is harmless, where the witness is afterwards permitted to give substantially the same testimony. *pp. 488, 489.*

MASTER AND SERVANT.—*Assumption of Risk.*—*Instruction.*—An instruction that a servant having no notice of a danger does not assume the same "when not so glaring and apparent as to be open to

the observation of ordinarily prudent men," is not erroneous, although the use of the word "glaring" is not to be commended. *pp. 489–491.*

MASTER AND SERVANT.—*Safe Appliances.—Presumption.*—An instruction that a servant directed to do a certain act may assume that safe appliances will be furnished is not erroneous for want of proof of his being directed in the particular instance, where the servant's general employment imposed such duties. *pp. 491, 492.*

SAME.—*Safe Appliances.— Duty of Employer.*— An employer is not bound to exercise the highest degree of skill and care, but must exercise ordinary skill and care, in° providing an employe with safe machinery and appliances. *pp. 492–494.*

From Wells Circuit Court; *A. N. Martin*, Judge.

Action by Ezra T. Lee, administrator of the estate of Glannor Sloan, against the Chicago and Erie Railroad Company. From a judgment for plaintiff, defendant appeals. *Reversed.*

*W. O. Johnson, J. B. Kenner, U. S. Lesh, A. L. Sharpe* and *C. E. Sturgis,* for appellant.

*J. S. Dailey, A. Simmons, F. C. Dailey* and *J. S. Branyan,* for appellee.

ROBINSON, J.—Suit by appellee for damages for wrongfully causing the death of his intestate. Demurrers to each paragraph of complaint overruled, and issues formed upon general denial. Motions by appellant for judgment on the jury's answers to interrogatories, and for a new trial, overruled. The two paragraphs of amended complaint are substantially alike. After the former appeal *(Chicago, etc., R. Co.* v. *Lee,* 17 Ind. App. 215) the complaint was amended so as to show that decedent did not know of the defective and dangerous condition of the roadbed at the particular place; that he did not know of the presence of the wires, and was wholly ignorant of the dangerous condition of the roadbed. The negligence charged against appellant is in maintaining the wires unboxed and uncovered at a place where employes in the line of their duty were

required to couple or uncouple cars. Some of the objections urged to the complaint might apply had a motion been made to make more specific, but as against a demurrer the complaint is sufficient. *Louisville, etc., R. Co.* v. *Lynch,* 147 Ind. 165, 34 L. R. A. 293; *Louisville, etc., R. Co.* v. *Kemper,* 153 Ind. 618; *Cleveland, etc., R. Co.* v. *Wynant,* 100 Ind. 160; *Pennsylvania Co.* v. *Brush,* 130 Ind. 347.

The jury returned answers to interrogatories as follows: On the 15th day of November, 1894, appellee's decedent was a brakeman on one of appellant's local freight trains, and had been in the employ of appellant as brakeman about three years. The accident occurred about nine o'clock a. m., on a fair day. For some days prior the deceased had run over the interlocking switch wires, and for some time previous to the accident he had switched cars on the track in the vicinity where the wires run under the track. He could have seen the wires and excavation which contained them at the time of the accident, by looking, had not his attention been absorbed by adjusting the links preparatory to coupling the train. The roadbed was in the ordinary state of repair, except the excavation, and the wires were left uncovered and in a dangerous condition. The deceased was walking sideways in front of the cars that were backing down, and was about 180 feet from the point where the coupling was to be made. The east end of the train, from which the engine and front cars had been detached, stood about seventeen or eighteen feet east of the depot platform. From the east car on the rear end of the train just east of the depot to the place where the wires crossed the track at the home signal was 195 feet, and from the same point to the point where the Y connection on the north connects with the main track is about 1,000 feet. The engine had taken two cars out of the Y., which were left standing on the main track just west of the east switch, while the engine was returning to the Y with the cars not to be taken. Dece-

dent threw the switch for the engine to return from the Y to the two cars, coupled them to the engine, and then signaled to the engineer to back up. The train then moved back west, and at the time decedent was injured it was moving at the rate of "an ordinary walk or about four miles an hour." Decedent gave the signal to back the train, and got on the car. When he gave the signal he was on the south side of the main track. He then crossed over in front of the moving cars to the north side, and then went back on the track in front of the moving car, and walked sideways on the track between the rails until the accident occurred. From the point where the accident occurred to the place where he was to make the coupling was at least six car lengths, and from the place where he entered on the track to adjust the link to the place he was to make the coupling was 195 feet. He could, by proper signals to the engineer, have caused the cars to stop or to slow up. The rules of the company forbade the deceased from going in front of the moving cars at the place where he did for the purpose of fixing the link or pin, and the rules did not require him to do this unless he thought he could do it with safety to himself. It was his duty to do this, and it was necessary for him to go in front of the cars when he went upon the track if he thought he could do so with safety to himself.

The moving cars would have slowed down for the purpose of enabling decedent to fix the coupling at a point from ten to thirty feet from the car to which the coupling was to be made, and would have come to a stop at from ten to fourteen feet unless the deceased would have given the proper signal to continue to back. Decedent could have seen the wires and the opening containing them, had he looked, about twenty-five or thirty feet away. The interlocking plant had been put in about one and one-half months prior to the accident, and was completed for operation October 1, 1894. The wires were in place about two weeks prior to the 13th day of October, 1894. The plant

had been in course of construction about two months prior to its use. During the time of the construction and operation of the interlocking plant, decedent had frequently passed over it on through and local freight-trains. The trench through which the wires passed was fourteen inches wide, and from four to six inches deep. The wires which passed through the trench under the rails were in good condition, excepting they were left uncovered. Decedent could have controlled the movements of the cars which were backing, by proper signals. It was the duty of the engineer, in backing to make a coupling, to stop at a distance of twelve to thirty feet from the car to which the coupling was to be made, for the purpose of allowing the brakeman to arrange the pin, and await a signal from the brakeman to back. The decedent on the 15th day of November, 1894, did not know of the presence of the wires in the roadbed. The interlocking switch system could have been as conveniently operated with the switch wires boxed, as with them open. Appellant had never designated any particular spot at or near where decedent attempted to adjust the link, where the link should be adjusted, or where the coupling should be made. Appellant maintained near its track at the place where decedent was killed a tool house, where it provided its employes with links and pins for couplings. Decedent had never been warned by appellant or its agents of the presence of the wires. The place where decedent got the link and attempted to adjust it was the usual place where employes prepared for the couplings. The engineer in charge of the locomotive slowed down at the toolhouse for the purpose of having decedent adjust the link preparatory for the coupling. Decedent's attention, while attempting to adjust the pin preparatory for the coupling, was wholly absorbed in his work. Decedent, while engaged in his duty as brakeman, ignorant of the presence of the interlocking switch wire, stepped into the excavation where the wires

were, and became entangled therewith, so as to throw him down in front of the car, then and there causing his death.

At the time of decedent's employment appellant placed in his possession a book of rules, requiring, among other things, employes to see for themselves that the machinery, tools, and material provided for them, or subject to their management and use, are in proper condition before using them; that under no circumstances should they go between cars unless they could do so with absolute safety. Jumping on or off trains or engines in motion, going between cars in motion to uncouple them, and all similar acts, are stated to be imprudent and hazardous and expose persons committing them to extraordinary dangers; and all employes are enjoined to avoid such dangers and are warned that if they commit such acts it will be at their own peril and risks; that the company desires its employes not to incur risks from which they can protect themselves by personal care, and by the exercise of their own judgment, and enjoins them to take, in all cases, the time necessary safely to do their duty, whether acting under the directions of their superiors or otherwise, and to subject themselves or others to unnecessary risks will be cause for dismissal.

The general verdict finds that appellant was negligent; that the decedent, in doing what he did at the time of his death, was free from fault. As the general verdict, unless overthrown by the special answers, will stand without the aid of any answers to support it, certain answers favorable to appellee, but which are properly conclusions, can have no effect upon the verdict and may be disregarded.

It is the general rule that a railroad company must construct and maintain its roadway in such manner as will enable its employes to perform their labor with reasonable safety. *Baltimore, etc., R. Co.* v. *Rowan,* 104 Ind. 88; *Louisville, etc., R. Co.* v. *Wright,* 115 Ind. 378, 7 Am. St. 432; *Indiana Car Co.* v. *Parker,* 100 Ind. 181; *Louisville, etc., R. Co.* v. *Sandford,* 117 Ind. 265. It is not claimed

by counsel that there are any answers to interrogatories in conflict with the general verdict finding appellant negligent. Answers to interrogatories must in and of themselves, without reference to any evidence, be in conflict with the general verdict, and consistent with each other, in order to overthrow the general verdict.

It is argued that upon the material elements of decedent's knowledge and assumption of the risk and his contributory negligence the answers are at variance with the general verdict. The general verdict and also a special answer find that decedent did not know of the existence of the wires. It is true, the answers find that decedent had run over the wires for some days prior to the accident; that he had frequently, during the time of the construction and operation of the interlocking system, passed over it on through and local freight-trains; and that he had switched cars in the vicinity, where the wires ran under the track, for some time previous to the accident. But this is not sufficient to overthrow the finding of the general verdict that the decedent could not have known of the existence of the wires by the exercise of ordinary care. When passing over them on a train he may have been in a place where it was impossible for him to see them. And he may have done switching in the vicinity, and still not have seen a defect in the roadbed, such as this was. There is no finding that decedent was ever in a position where it can be said that he must necessarily have seen the trench and wires. The findings do not show that decedent had worked in and about this particular place such a length of time as that it could be said he must necessarily know of the existence and condition of the trench and wires.

It is true the jury were asked, "How far could the deceased have seen the interlocking switch wires, and the opening containing the wires, had he looked?" and answered "About twenty-five or thirty feet." But we can not presume, in order to aid the answer, that this was at a par-

ticular time, or from a particular point of view. The jury did find that decedent could have seen the trench and wires at the time of the accident, by looking, had not his attention been absorbed in attempting to adjust the pin preparatory to making the coupling. This would not excuse an employe from looking, if it appeared that he was in a place where he must necessarily know that certain appliances were in use, and there was an open and obvious defect in such appliance. For instance, a brakeman, whose duty includes the handling of switches, may assume the risk incident to unblocked frogs and switches, where such appliances are in common use along the road on which the brakeman is employed. Such a risk is one that is ordinarily incident to the discharge of his duties as a brakeman. They are appliances with which he works, and are found on the premises where he necessarily performs the duties of his employment. The appliances themselves are a warning that they may be dangerous.

But in the case at bar it is not shown by the answers whether or not the decedent was familiar with interlocking switch systems. It is not shown that they were in common use on that part of appellant's road where he worked, nor in fact that such a plant was in use at any other point. It is not shown that it was an appliance with which or about which at any time he was required to perform any of his duties as a brakeman. He had nothing to do with the interlocking plant. He was not required to be familiar with its construction and operation in performing his duties as brakeman. He did not know of the existence of the trench and wires. There was nothing, while performing his duties, to warn him that he was in a place that might be dangerous. He had the right, although held to diligence for his own safety, to presume that his employer had invested the place where he was working with such safeguards as ordinary prudence required. He could not assume the risk attendant upon the use of an appliance of

an unusual character where he was ignorant of its existence, and had no notice of any danger. The language used by Hadley, J., in *Indiana, etc., R. Co.* v. *Bundy,* 152 Ind. 590, 598, is applicable here: "Appellant cites numerous cases in support of its contention that the risk was an assumed one. But it must be borne in mind that the rule contended for is relative, and not absolute, and its application must be determined by what constitutes reasonable and ordinary care, under the facts of each particular case."

It is also argued that the answers show that the decedent was guilty of contributory negligence in going in front of the car, moving at the rate it was, and walking sidewise, to adjust the link, at so great a distance from the place where the coupling was to be made. It appears the car was moving at the rate of an ordinary walk, or about four miles an hour, that it had started back at the rate of four or five miles an hour, and that the engineer had decreased the speed at the tool-house for the purpose of having the decedent adjust the link preparatory for the coupling. We find no rule of appellant in the answers that the decedent violated. It is not shown that he disobeyed any instructions. On the contrary, the jury answer that what decedent did was in the performance of his duty, and that what he did was necessary. The excavation and wires were uncovered and in a dangerous condition. He had never been warned of the presence of the wires, and did not know they were there. The place where he got the link and attempted to adjust the coupling was the usual place where employes prepared for the couplings. The engine was slowed down for the purpose of having him adjust the link preparatory for the coupling. The answers are not in irreconcilable conflict with the finding of the general verdict that decedent was free from contributory negligence.

Objection is made to the court's refusal to permit a witness to answer the following question: "Now, you may tell the jury whether or not that plant, with reference to

the way the wires are put under the track that runs to the home semaphore pole or the home signal, is the same as is used by other railways at that time in 1894." Immediately following this refusal the witness was permitted to answer questions asked by appellant,—that he was acquainted with the system of interlocking switch wires generally in 1894, and that he knew what the practice of railroads generally was in 1894 as to the construction of the interlocking switch wires, and especially as to running wires under the track,—as to whether they were covered or not. The witness then stated that he was acquainted with the practice of railroads generally in 1894 as to the construction of the interlocking switch wires, and especially as to running wires under the track,—as to whether they were covered or not,—and was then asked: "Now what was the practice of railroads generally as to covering, or leaving the wires run under the rails to the signals covered or uncovered in 1894?" A. "Those that I was acquainted with were unboxed." The witness then gave a description of the manner in which the interlocking system works, and of the operation of the plant in question. From this condition of the record we fail to see how it can be successfully claimed that the court's refusal to permit the witness to answer the particular question was reversible error.

It is also stated in appellant's brief that certain evidence was improperly admitted, and certain other evidence improperly excluded. But these questions have not been argued by counsel. The brief contains nothing more than the mere statement of the propositions. No authorities are cited, and no arguments made. It has been repeatedly held that an alleged error is waived by failure to discuss it.

It is also argued that certain instructions given are erroneous. Counsel, in their brief, have argued but three of the instructions,—numbers twelve, twenty, and twenty-five, which read as follows: "(12) A railroad company is re-

quired to use ordinary care in constructing and maintaining its railroad, switches, and appliances in such a manner and condition that its servants can do and perform all labor and duties required of them with reasonable safety; and a servant has a right to presume that the company has in these respects done its duty, and a servant does not assume risks flowing from its employer's negligence in those duties nor is there imposed upon him any unusual degree of watchfulness or care to discover defects in the railroad and switches when he has no notice of danger, and when not so glaring and apparent as to be open to the observation of ordinarily prudent men, and when not specially directed thereto by his employers, and will not be presumed to know the danger therein when of such a character that they might well escape the observation of a prudent person. (20) I instruct you that the mere fact that Glannor Sloan may have known that the defendant was putting in an interlocking switch system at DeLong very recently before the accident, but did not know how the wires thereof were to be placed across the track, that of itself would not be notice to him of the presence of the wires as alleged in defendant's roadbed at the place where he was killed. For a servant may assume that the master will do his duty, and therefore when he is directed by proper authorities to perform certain. services, or to perform them in a certain place, he ordinarily will be justified in obeying orders, subject to the qualifications that he may not rashly or deliberately expose himself to unnecessary and unreasonable risks which he knows and appreciates; it is one thing to be aware of defects, and another to know and appreciate the risks resulting therefrom. (25) While it is the law that railway companies are not required to keep their machinery and railroad bed free from all danger, yet railroad companies are required, under the law, to use their highest care in providing persons in the employ of such companies a reasonably safe place to do the work required of them."

The use of the word "glaring" in the twelfth instruction is perhaps not to be commended, but it does not necessarily have the meaning given it by appellant's counsel. It is, in its ordinary meaning, a stronger word than apparent, but it is sometimes used synonymously with the words open and manifest. Soule's Synonyms; Webster. There is no authority for saying that from the use of the words "glaring and apparent" the jury must have understood the words to mean "glaringly apparent." There is no presumption that an injured party knew of a defect in the roadbed which caused his injury. He is required to aver that the defect was unknown to him, and he must not only prove this, but must also prove that he could not have known it by the exercise of ordinary care. Whether he did know of the defect or could have known it were facts to be proved, the burden of which was upon appellee. Upon these questions the jury were fully informed by instructions given. In *Bradbury v. Goodwin,* 108 Ind. 286, in discussing the question of the employer's duty to furnish means and appliances safe and adequate to the purpose for which they were designed, the court said: "Since it does not appear that the appliances were glaringly or palpably inadequate, the appellee was not chargeable with knowledge or responsibility as to their character or suitableness. He was, therefore, justified in supposing that such skill, prudence, and foresight had been employed in their preparation as rendered them safe."

Against the twentieth instruction it is argued that the instruction assumes, contrary to the proof, that the decedent was directed to do the act which resulted in his death. If he was employed by appellant as a brakeman, and one of the duties of a brakeman was to do the thing decedent was attempting to do when killed, it may be said that he had been directed to do the particular thing. The instruction does not necessarily mean that he was at the particular time directed to do the act. The clause, "It is one thing to be aware of defects, and another to know and appre-

ciate the risks resulting therefrom," was not erroneous, nor was it misleading. Knowledge of a defect and knowledge of the dangers and risks resulting therefrom are not necessarily the same. In *Consolidated Stone Co.* v. *Summit*, 152 Ind. 297, 302, the court, by Monks, J., said: "The mere fact that a servant may know or could have known of a defect by the exercise of ordinary care does not necessarily charge him with an assumption of the risks growing out of such defect, because the risks and hazards on account thereof may not be so open and apparent as to be appreciated by him, on account of his ignorance or want of experience." Citing *Wuotilla* v. *Duluth Lumber Co.*, 37 Minn. 143, 33 N. W. 551, 5 Am. St. 832; *McDonald* v. *Chicago, etc., R. Co.*, 41 Minn. 439, 43 N. W. 380, 16 Am. St. 711; I Bailey Per. Inj., §§852, 857.

While the twelfth and twentieth instructions contain expressions which should probably have been omitted, yet, when taken in connection with all the instructions given, we can not say that the giving of either of them was reversible error.

The twenty-fifth instruction, under the rulings of the Supreme Court, should not have been given. The general rule has often been stated that the employer is not bound to exercise the highest degree of skill and care, but must exercise ordinary skill and care in providing the employe with a safe working place and with safe machinery and appliances. *Pennsylvania Co.* v. *Whitcomb*, 111 Ind. 212; *Krueger* v. *Louisville, etc., R. Co.*, 111 Ind. 51; *Pittsburgh, etc., R. Co.* v. *Adams*, 105 Ind. 151, 162. The rule as thus stated is that the employer must exercise ordinary care in providing a safe working place. That is, the obligation of the master to provide a safe working place does not impose upon him the duty of using extraordinary care and diligence, but he is required to be ordinarily careful and diligent. In the instruction in question the jury were not told that the working place provided must be safe, but that it

must be reasonably safe. The exercise of skill and care in providing a reasonably safe working place would satisfy the rule. We think the rule might be stated that the employer must exercise ordinary skill and care to provide a safe working place, or the employer must exercise skill and care to provide an ordinarily safe working place. While the rule might be stated in either form, yet the duty of the master in the one case is not different in character from his duty in the other. If he seeks to excuse himself by showing he has provided a safe place, he must show that it is such a place as an ordinarily prudent man would have provided under like circumstances; and if he shows he has provided a reasonably safe working place, his duty is performed. But in each instance his duty is a relative one. In the instruction in question the jury were not told that a safe working place could be provided only by the exercise of the highest care, but they were told, in effect, that a reasonably safe working place must be provided, and that in providing it the highest care must be used. It is true, the jury were told in other instructions that it was the duty of the company to use reasonable care to maintain its track in a reasonably safe condition for the performance of the duties required of its employes, and they also answered that the roadbed was in the ordinary state of repair at the time and place of the accident, except the excavation and wires were left uncovered and in a dangerous condition.

In *Pennsylvania Co.* v. *Whilcomb,* 111 Ind. 212, the court said: "It is undoubtedly the duty of the employer to provide the employe with a safe working place and with safe machinery and appliances. The employer is not bound to exercise the highest degree of skill and care in discharging this duty, but he is required to exercise ordinary care and skill."

In *Pittsburgh, etc., R. Co.* v. *Adams,* 105 Ind. 151, 162, it is said that it has become the settled law, "with scarcely an exception, that, as a general rule, in the contract of hir-

ing, there is an implied undertaking upon the part of the master that he will use all reasonable care to furnish safe premises, machinery, and appliances for conducting the business safely." See, also, *Hough* v. *Railway Co.,* 100 U. S. 213, 25 L. Ed. 612, and note 814; *Indiana Car Co.* v. *Parker,* 100 Ind. 181, 187; *Umback* v. *Lake Shore, etc., R. Co.,* 83 Ind. 191; *Louisville, etc., R. Co.* v. *Orr,* 84 Ind. 50; *Lake Shore, etc., R. Co.* v. *McCormick,* 74 Ind. 440.

Under the rule as above declared, we think the instruction must be held erroneous. It is true the jury were correctly instructed upon the question; but the erroneous instruction was not withdrawn from the jury, and the instructions properly given would not cure the error. "This could only be done," said the court in. *Wenning* v. *Teeple,* 144 Ind. 189, "by plainly withdrawing the instructions named from the jury, which was not done in this case. * * * Besides, if two or more instructions are inconsistent and calculated to mislead the jury or leave them in doubt as to the law, it is a cause for reversal."

The motion for a new trial should have been granted. Judgment reversed.