GRAND TRUNK WESTERN RAILWAY COMPANY *v.* CATHER.

[No. 13,123.   Filed June 26, 1929.   Rehearing denied October 8, 1929. Transfer denied June 26, 1931.]

*Parker, Crabill, Crumpacker & May* and *W. S. Carlisle,* for appellant.

*Samuel Feiwell* and *Seebirt, Oare & Omacht,* for appellee.

McMAHAN, C. J.—This is an action by Doris Cather against the Grand Trunk Western Railway Company for personal injuries occasioned by reason of a collision between an automobile in which the plaintiff was riding and a locomotive of appellant, at the point where the railroad tracks cross Olive Street in the city of South Bend. There was a verdict and judgment in favor of the plaintiff for $3,000. The defendant has appealed and assigned as error the overruling of its motion for a new trial.

The complaint charges that appellant's tracks, at the point where they cross the street, ran in a northeasterly direction; that Olive Street is a north and south street; that, on August 8, 1926, while appellee, as the guest of the driver, was riding in an automobile going south, one of appellant's trains collided with the automobile and injured her; that, as the automobile approached the railroad crossing, a number of box cars were standing on the tracks, both east and west of the street; that, as plaintiff approached the crossing, the automobile was stopped, and both the driver and appellee looked and listened for approaching trains; that, after the automobile was stopped, plaintiff noticed a switch engine that was being operated on one of the many tracks crossing the street; that, as the switch engine passed over the crossing, plaintiff and the driver of the automobile again looked and listened for approaching trains; that they neither

saw nor heard an approaching train and proceeded to cross the railroad; that, as they got on one of the tracks, the automobile in which she was riding was struck by one of appellant's trains, which was being negligently operated at a high and dangerous rate of speed, 40 miles an hour, in violation of an ordinance of the city which provided that no train should be run in the city limits at a greater speed than eight miles an hour, and that the bell on the engine should ring while the engine was in motion; that there was no flagman at the crossing to warn travelers of approaching trains and that the bell and whistle were not sounded, and no warning of the approaching train was given; and that, by reason of the collision, she was injured.

Appellant contends: (1) That the verdict is not sustained by sufficient evidence; (2) that it is contrary to law; (3) that the court erred in giving certain instructions; and (4) that the court erred in refusing to give an instruction.

William E. Watson, the driver of the automobile, on direct examination, testified; that he was a postal clerk; took appellee to a dance; danced until 11:30 p. m., then started home; came to Olive Street, turned south toward railroad tracks; when he came to the first track, he stopped and looked both ways; neither saw nor heard any trains; noticed a switch engine working on the south side of tracks; waited until it had practically cleared the tracks; looked again and then proceeded to cross; had gone about 60 feet, when hit by a train; was driving Ford sedan; heard no whistle; noticed the signals, but they were not in operation; first saw the train when it was about eight feet from the automobile; was traveling in low gear; Miss Cather was riding on the right hand side and, in the collision, the automobile was turned around; didn't find Miss Cather right away; heard her groan; saw her down the tracks 50 or 60 feet east of automobile;

got to her as quickly as possible; did not have strength to pick her up; she was taken to the hospital with the aid of another car that came along; she was not able to walk; Dr. Acker was called; after the accident, the car was about 25 to 30 feet east from where it was struck. On cross-examination, he testified that the brakes were in good condition; the sides of the car were fitted with glass; knew the road; had been over it a few times; Olive Street ran north and south and is paved; the train was coming from the southwest; stopped north of the first track we came to, and did not stop after that; moved along slowly and steadily until we were struck; Miss Cather did not say anything to me about a train coming; had no warning of a train approaching until just the instant of the crash; the only thing noticed was the engine; stopped and watched the switch engine, thinking it might cross the track; it was south of the Grand Trunk tracks, and backing west; it was south of the track on which the crash occurred, and was east of Olive Street; we were not talking; there were some box cars west of Olive Street not far from the street; Miss Cather had been over this crossing with me several times before; should say about three times; saw engine when it was about eight feet away from automobile; was looking that way; saw headlight; don't remember hearing it; drove a Ford automobile off and on for eight years prior to the accident; the brakes were in good shape and, at the speed I was driving at the time of the accident, could have stopped the automobile in three feet and avoided the accident at any time before the front wheels were on the track the train was on, if had seen the train approaching; the switch engine came from the east as if it were going across the track; it came up to Olive Street, then it went back a little way; when it went east, we started across the track; my eyesight and hearing are both good.

Appellee testified, on direct examination that she lived

in Mishawaka, was 21 years old January 21, 1927; had been stenographer for South Bend Watch Company for five months; on the night in question, went to a dance with William Watson at Hudson Lake, in a Ford sedan; Watson did the driving; reached Hudson Lake at 9:30 p. m.; danced until 11:30 p. m., when we started home; stopped when we reached the tracks; both Watson and I looked east and west; saw a switch engine working back and forth east of us; it came from east; waited until it went back east and then started to cross the tracks; heard no bell or whistle; the only thing remembered after starting up was there was an accident and witness taken to the hospital. On cross-examination, she testified that she and Watson had driven over the crossing in question on several occasions; did not see the train until it struck them; he must have screamed just as it hit us; after we stopped the automobile north of the tracks and started to cross, she did not talk to Watson; we looked up and down the track, when we were standing still and while we were moving; saw some box cars standing near the crossing; don't know how many; stopped before we came to the track the cars were on; then moved steadily at a moderate speed until the accident; she was sitting in the front seat on the right hand side; there was glass in the door; it was shortly after midnight when the accident happened; did not see the engine that struck her.

It was stipulated that the engine and train in question were property of the defendant railroad company and were traveling in an easterly direction on the east-bound main track; that the west-bound main track was north of the east-bound main track a distance of 15 feet from the center to the center of the tracks; that north of the west-bound main track was the passing track, at a distance of 15 feet, center to center, from the west-bound main track; that, north of the passing track was a track called the "new track;" that the south rail of the long

track was 60 feet and seven inches north of the north rail of the east-bound main track; that north of the long track was the track of the New Jersey, Indiana & Illinois Railway Company, which was the farthest north of any track in the vicinity; that the New Jersey track was not less than 15 feet, center to center, north of the long track; that the box cars mentioned were located on the long track; that the coal dock of the defendant is 819 feet west of the west line of Olive Street; that the tool house of the defendant shown on photograph marked Exhibit C is located 75 feet west of Olive Street; that Olive Street is a public street, not less than 50 feet wide and paved for 20 feet of its width; that the New York Central Railroad Company owns four tracks crossing Olive Street, south of the tracks of appellant; south of the east-bound main track is another track of appellant known as the "lead track" that leads from the Grand Trunk tracks to the New York Central tracks; that it is 22 feet, nine inches from the north rail of the east-bound main track to the south rail of the passing track; that there was in effect in the city of South Bend an ordinance which provided that no railroad company should run a locomotive or train within the limits of South Bend at a greater speed than eight miles per hour, and that all engines should signal by ringing the bell; that there was also in effect an ordinance requiring the railroad companies to maintain at Olive Street, where their tracks cross, manual flash lights, which were operated from a tower, between 6 p. m. and midnight of each day, but not requiring their operation between midnight and 6 a. m.; that the accident in question occurred at 12:30 a. m., and the flash lights were not then in operation.

M. M. Howie, yardmaster, testified that the long track is the north track of appellant and that the New Jersey track is north of it; that there were six or seven refrigerator cars, the east end of them being about 60

feet away from the line of Olive Street; that they had not been moved during the night.

E. L. Merrill, claim agent, testified that he measured the distance the cars were from Olive Street and that they were 64 feet west of the west curb.

Nelson C. Ross, the fireman, testified that he was in the engine when appellee was hurt; that the bell was ringing automatically as the train approached Olive Street; that the whistle was sounded just west of the coal dock; two long and two short blasts. On cross-examination, he testified the bell was ringing automatically from the time they left Valparaiso; had in mind, in testifying, that ringing bell was the customary thing he did; knew the bell was ringing; recalled and knew it was ringing; had an independent recollection that it was ringing from the time they left Valparaiso; was sitting on seat box when whistle was blown for crossing just west of coal dock; no target or whistling post there; were 400 or 500 feet away from crossing when whistle was blown for crossing.

Amos Miller, the engineer, testified the whistle was blown at west end of coal dock, two long and two short blasts; the bell was ringing and headlight burning. On cross-examination, he testified that the train was going about eight miles an hour; did not know how far they were from crossing, except that they were at the west end of coal dock; might have been 700 or 800 feet; started bell ringing when they left Valparaiso, and it rang all the way; it was a passenger train with 11 coaches; passed Olive yards 12 times a month, going eight miles an hour as near as he could figure; it was his duty to have bell ringing and he made the statement for that reason; nothing happened that called his attention to whether the bell was ringing; knew the bell was ringing and that the train was on time.

A number of photographs showing the crossing, the

location of the tracks, the location of the cars on the long track and west of the crossing, the coal dock, toolhouse, and other obstructions to the view of one looking west from Olive Street, and also showing situation looking east, were introduced in evidence. One of these photographs, Exhibit C, shows that, to the west of Olive Street, between the passing track and the new track and north of the west-bound track, there is a line of telegraph poles, an elevated tower house, a toolhouse and other obstructions. It shows a space between the new track and the passing track where a traveler on the street could not, by looking to the west, have seen an approaching train until it had reached a point opposite the coal dock. The view of a train west of that point would have been wholly obstructed from view by reason of the above-mentioned obstructions.

We recognize that photographs are sometimes deceptive and misleading. They are taken from a fixed point. In the instant case, the camera with which the photographs were taken, was stationary, and shows the situation as it appeared in the daytime, at the points where the camera was located. They do not show the exact situation as it would appear in the nighttime to a traveler whose position was continuously changing. The photographs which were before the jury, however, conclusively show that, from the time appellee crossed over the track on which the box cars were standing, until she reached a point where the poles and toolhouse did not obstruct her view, there was a space from 20 to 25 feet that her view of a locomotive between the coal dock and toolhouse would have been obstructed.

The jury, by its general verdict, found that appellant was negligent as alleged in the complaint. Appellee and Watson testified that when they reached the first track, which was north of the one on which the cars were standing, they stopped and looked both to the east and to the

west; that they waited until the switch engine had gone back to the east, when they proceeded slowly to cross the tracks; that as they did so they looked both to the east and to the west and neither saw nor heard a train. The evidence does not show the particular place they were when they looked to the west after they started to cross the tracks. The jury had a right to believe them when they said they looked to the west when they first stopped, and that they saw no train. The train, at that time, may not have been within the range of their vision. The evidence does not show how far a train could have been seen from that point. They stopped before reaching the first track. The string of cars on the next track south of them obstructed their view. The jury would have been justified in concluding that they might have first looked to the east as they started to cross, as they had been waiting and watching for the switch engine to pass back in that direction. If they had looked to the east until they crossed the track on which the box cars were standing and then looked to the west, their view between the toolhouse and coal dock would have been obstructed by the toolhouse to such an extent that a locomotive between the toolhouse and the coal dock could not have been seen. It is not reasonable to conclude that, having looked to the west at this point, they again looked to the east, and that, when they reached the east-bound main track, they were struck by the train, which they had not theretofore seen.

The evidence does not show the dimensions of the toolhouse or of the coal dock. One of the photographs, Exhibit B, shows that the toolhouse is large enough to completely cut off the view of the east end of the coal dock, except that part which is visible over the top of the toolhouse. If appellee had looked to the west when she was at a point 60 feet from the east-bound track, her view of a locomotive approaching the crossing from the

west and between the toolhouse and the coal dock would have been obstructed unless the headlight on the locomotive was high enough so it could have been seen over the top of the toolhouse, and there is no evidence as to the height of the toolhouse or of the headlight of the locomotive. It is stipulated that the toolhouse is 75 feet west of the street; that the street is 50 feet wide; and that the the coal dock is 819 feet west of the street. The distance between the toolhouse and the coal dock where appellee's view of a headlight and train would have been obstructed is about 700 feet. The jury may have concluded that the locomotive was between the toolhouse and coal dock when appellee was 60 feet from the point of collision, and that, at that time, her view of the locomotive was obstructed by the toolhouse. Under such circumstances, the train would not have had to run at an unseemly speed to reach the crossing coincident with appellee. The jury would have been justified in finding that the train in question, at the time of the accident, was running in excess of eight miles an hour. Indeed, appellant makes no claim that the evidence is not sufficient to sustain a finding that it ran the train at a speed of more than eight miles an hour in violation of the city ordinance. It is noticeable that, while appellant submitted 37 interrogatories which the jury answered in connection with the general verdict, no interrogatory was submitted relative to the speed of the train. The only contention which appellant makes in connection with the insufficiency of the evidence relates to the contention that appellee was guilty of contributory negligence and for that reason should not recover. In this connection, appellant incorrectly states the facts when it says appellee's view to the west was unobstructed after she reached a point 60 feet from the point of collision.

We cannot agree with appellant in its statement that it was appellee's duty to realize and to have in mind that

she was approaching danger, "and to ascertain ██ for herself whether a train was approaching and to warn the driver of the automobile." Appellant would have us say it was the absolute duty of appellee to ascertain whether a train was approaching and to warn the driver, when, as a matter of law, she was required to exercise only reasonable care to ascertain such fact and to warn the driver. The evidence is ample to sustain the verdict of the jury.

Appellant next contends the court erred in giving instructions 3 and 4. Instruction 3, after setting out the complaint and answer, told the jury that the gist of the action was the negligence of appellant as alleged, and fully explained the negligence charged in the complaint. The court then told the jury that, before appellee could recover, she had to prove by a fair preponderance of the evidence one or the other of such acts of negligence and that such act or acts so proved were the direct and proximate cause of her injury. The concluding part of the instruction is as follows: "It is not sufficient for plaintiff's recovery that she so proves the negligence of the defendant, and, notwithstanding any such negligence of the defendant, if you find from the evidence that the plaintiff was negligent and her negligence was *the* proximate cause of her injuries, the plaintiff cannot recover in this action. In an action of this kind contributory negligence of the plaintiff is a matter of defense; in order to constitute a defense that will defeat plaintiff's right to recover in this action, such contributory negligence must be proven by a preponderance of evidence and it must also be proven that such contributory negligence was *the* proximate cause of plaintiff's injuries."

In instruction No. 4, the court first correctly defined contributory negligence, and concluded as follows: "If you find that the defendant was guilty of the negligence alleged in plaintiff's complaint, and if you also find that

the plaintiff was guilty of contributory negligence, I instruct you that such contributory negligence on the part of the plaintiff will not defeat plaintiff's recovery in this action unless you further find that such contributory negligence was the proximate cause of plaintiff's injuries. On the other hand, if you find that plaintiff was guilty of contributory negligence and further find that such contributory negligence of the plaintiff was the proximate cause of plaintiff's injuries, then I instruct you that the plaintiff cannot recover of the defendant in this action notwithstanding that you may find the defendant guilty of the negligence alleged in plaintiff's complaint."

This court, in *Vandalia R. Co.* v. *Fry* (1919), 70 Ind. App. 85, 123 N. E. 124, referring to the contention that it was reversible error to give instructions similar to instructions 3 and 4, said: "It (appellant) claims that each of these instructions is erroneous, because they placed on appellant the burden of proving that appellee's negligence was the proximate cause of his injury, while the rule is that there can be no recovery in an action based on negligence if the negligence of the complaining party contributed in any way thereto. It is well settled that, in order for the negligence of an injured party to defeat his right of recovery, such negligence must be a proximate and not a remote cause of the injury. It is not necessary that it shall have been the sole cause, but it is sufficient if it enters into and forms part of the efficient cause thereof. . . . In order to determine whether the jury could have been misled by either of said instructions with reference to the effect of any negligence of appellee which may have been only a concurring proximate cause of the injury, we must consider the instructions as a whole, and not in detached portions. . . . We observe that the jury was informed by another instruction given by the court on its own motion, that contributory negligence on the part of appellee which

caused, or *partly* caused, his injuries, was a complete defense to the action. In view of this fact, it is apparent that the jury could not have been misled by the language used in either of said instructions, and hence there was no reversible error in giving the same."

As was said in *Cleveland, etc., R. Co.* v. *Miller* (1905), 165 Ind. 381, 74 N. E. 509: "In the consideration of an instruction, the initial point of inquiry is, was the jury misled? . . . A cause ought not be reversed merely because it is obnoxious to verbal criticism." To the same effect, see *Moore* v. *State* (1926), 198 Ind. 547, 553, 153 N. E. 402, 154 N. E. 388, and authorities there cited.

In view of the well-settled rule that the instructions given should be considered as a whole, we call attention to instructions 10, 11, 12 and 13, given by the court on its own motion, and to instruction 6, given at the request of appellant.

Instruction 10 was to the effect that a person approaching a railroad crossing must use ordinary care to avoid injury; that, in such a case, it is requisite to the exercise of ordinary care that a person who is about to cross over a railroad crossing look both ways and listen attentively for approaching trains, and if, by looking, such person would have seen, or if by listening would have heard, the approaching train in time to have avoided the collision, it will be presumed, in case there is a collision, that she either did not look and listen, or that she did not heed what she saw or heard, in either of which events, she was guilty of contributory negligence, and that if she failed to exercise such care and such failure caused the injury of which she complains, or if it *proximately contributed* to such collision and injury, she could not recover, though the defendant was negligent.

Instruction 11 told the jury that a person crossing a railroad was rightly required to do all that ordinary care

and prudence would suggest to avoid injury; that, if the presence of cars or other obstructions made it more difficult to see or hear, greater precautions must be taken to avoid injury than would otherwise be necessary, and that, if the jury found appellee did not use ordinary care and prudence under the circumstances existing at the time she went upon the tracks of the defendant, such failure would be *contributory negligence, and would defeat a recovery.*

In instruction 12, the court told the jury that if the carelessness and negligence of appellee and not *any* negligence of the defendant was the proximate cause of her injury, she could not recover.

In instruction 13, the court, after instructing the jury as to the duty of a person crossing a railroad to use her eyes and ears to detect the presence of an approaching train, told the jury that if it found from the evidence that appellee failed to perform that duty and if, by performing it, she, by the exercise of ordinary care, might have avoided the danger, *such failure was contributory negligence on her part and that she could not recover.* In instruction 6, given at the request of appellant, the court again told the jury that, if appellee did not look for or listen for an approaching train, and *such failure proximately contributed to* or brought about her injury, she could not recover.

With all of these instructions before it, we do not believe the jury was misled by the technical error of the court in using the word "the" instead of the indefinite article "a."

Instruction No. 7, of which complaint is made, told the jury that appellant could not relieve itself from the charge of negligence alone by giving the statutory signals, if, considering all the facts, it failed to exercise ordinary care, and that the jury might consider the circumstances and surroundings at the crossing in question, and the

speed of the train, and determine what, if any, signals other than the statutory signals should have been given by appellant in the exercise of ordinary care, and if it found that appellant failed to give such signals as were so required, appellant might be found negligent. Appellant says this instruction authorized the jury to go into the question of the propriety of operating the flash signals between midnight and 6 a. m. and to find appellant negligent for failure to so operate them. The court, however, in another instruction, and in no uncertain words, told the jury that appellant, under the ordinance of the city, was not required to operate the flash lights between midnight and 6 a. m.

The only other objection to this instruction is that it did not confine the "other" signals to signals by bell or whistle or to the operation of the train. As was said by this court in *Guion* v. *Terre Haute, etc., Traction Co.* (1924), 82 Ind. App. 458, 464, 143 N. E. 20: "It suffices to say, in answer to this, that if said instruction is erroneous in the particular first stated, appellant has failed to point out any evidence of remote negligence to which the jury may have applied the instruction, and thereby harmed appellant, as was his duty to do, if he seeks a reversal because the instruction would have permitted such an application." Appellant, before the beginning of the argument, knew what instructions the court was going to give. If it thought the instruction was not as definite as it should have been, or if it thought the instruction should have been more specific, it should have tendered an instruction in accordance with its theory, instead of taking its chances on a favorable verdict, and in case of an adverse verdict seek a reversal on appeal. Appellant has failed to point out any evidence of negligence on its part in relation to the giving of signals, which, in our judgment, could have improperly

influenced the jury in determining the questions covered by instruction No. 7. The error, if any, in the giving of such instruction, was, therefore, harmless. *Evansville, etc., R. Co.* v. *Hoffman* (1917), 67 Ind. App. 571, 578, 118 N. E. 151. An instruction may be erroneous, but if no improper evidence was admitted which might have tended to influence the jury to render an unjust verdict, such instruction will be held to be harmless. *Inland Steel Co.* v. *Gillespie* (1914), 181 Ind. 633, 644, 104 N. E. 76; *Pittsburgh, etc., R. Co.* v. *Reed* (1909), 44 Ind. App. 635, 88 N. E. 1080.

We conclude that no reversible error has been shown in overruling the motion for a new trial.

Judgment affirmed.

Nichols, J., dissents.

## DISSENTING OPINION.

NICHOLS, J.—I cannot agree to the majority opinion herein, and therefore I dissent. I am compelled to challenge some of the statements of fact in the majority opinion as misleading without the aid of photographs in evidence, and I shall, therefore, make such photographs a part of this dissenting opinion, with the hope that they may be made a part thereof as published. The following is a photograph taken with the camera located 60 feet north of the east-bound track on which the train was running to the east, and with the camera looking in the direction from which the train came. I am assuming that the natural eye could see the same things that the camera's eye saw.

I first call attention to the box cars which are mentioned so prominently in the complaint and in the majority opinion, and to the fact, as appears by the camera, that when the automobile in which appellee was riding was yet 60 feet from the crossing, these box cars were

Exhibit "B"  Camera 60′ from Crossing

then back of the automobile, and that they were wholly eliminated as an obstruction to the view. The effect of mentioning them in any way is to create a wrong impression that they were obstructions to view. The building farthest to the west is the coal dock, which was 819 feet west of the crossing, and to the side of which can be seen the tracks of appellant's railroad. The south track is the one on which the train was running that was involved in this accident. Now, notice how little the "line of poles" obstruct our view as we look in the direction in which the camera was looking. They would scarcely make a blur on the bright electric headlight of the engine. The watch tower is on posts high in the air, so that we look under it when we look in the direction in which the camera was looking. The posts on which it was standing make but little obstruction to our view. While we are looking, just imagine a train coming, as it were, from behind the coal dock, 819 feet away. Does any one think he would have any difficulty in seeing it all the way from the place of its first appearance to the crossing? The majority opinion tells us that a photograph shows that "to the west of Olive Street, between the passing track and the new track, and north of the west bound track, there is a line of telegraph poles, an elevated tower house, a toolhouse and other obstructions. It shows a space between the new track and the passing track where a traveler on the street could not, by looking to the west, have seen an approaching train until *it had reached a point opposite the coal dock.*" But the coal dock was 819 feet to the west of Olive Street, nearly a sixth of a mile, and a look at the photograph shows that, from that point, all the way to Olive Street with the camera 60 feet from the crossing, the view was wholly unobstructed, and from that point, 60 feet away, there was nothing to obstruct the view as appellee and her driver approached the crossing. Whether the train

Exhibit "C"  Camera 35' from Crossing

could have been seen west of the coal dock cannot possibly make any difference. It was then too far away to affect the conditions surrounding the accident.

The photograph above taken with the camera 35 feet north of the east-bound track, fully corroborates the statement that there was no obstruction to the view, after within 60 feet from the crossing. If there is an obstruction of any kind or character between us, standing with the camera 35 feet north of the east-bound track, I fail to see it. As it appears to me, the photograph does not show even a straw to obstruct the view. The photographs show that the train, with its glaring electric headlight burning, had to be in plain view after it left the coal dock 819 feet away. I agree, however, that had we been at this place, 35 feet north of the east-bound track, at the time and just as appellee was, we could not have seen the train coming from behind the coal dock, for the reason that it was not there. As the photograph shows that there was no obstruction whatever this side of the coal dock, the train would have had to be beyond the coal dock to be out of sight, and we agree that it would have had to travel more than eight miles per hour to reach the crossing with appellee's automobile. Appellee's automobile was being driven in low gear, over railroad tracks, and so slowly that, according to the driver's testimony, it could have been stopped in three feet; certainly, then, it was not traveling more than six miles an hour. If the automobile was traveling three miles per hour, after it reached a point 30 feet from the crossing, the train, if emerging from behind the coal dock, would have had to travel 82 miles per hour to reach the crossing with the automobile. If traveling six miles per hour, then the train would have had to travel 163 miles per hour, and if traveling 10 miles per hour, then the train would have had to travel 273 miles per hour. All this goes to show that the train

was not so far from the crossing. Had the train been running 40 miles per hour, and there is not a scintilla of evidence to that effect, it would have knocked that Ford sedan into smithereens, instead of just carrying it about 25 feet and just turning it around. It does not appear by the evidence that the car was in any way damaged, not even that a glass was broken. What a fine opportunity to have shown something of the speed of the train by showing that the car was badly wrecked. While the evidence does not undertake to account for appellee being found so far to the east of the place of the accident, it needs no argument to convince any reasonable person that she was not knocked that distance. Had such been the fact, she would have been killed instantly, instead of having a fracture of the left humerus. But, assuming that the train was traveling 40 miles per hour, which is the limit of averment in the complaint, with no proof to sustain it, and the automobile was traveling at six miles per hour, the train could have been not more than 400 feet from the crossing, and the photograph taken at 60 feet shows that the only obstruction to seeing the electric headlight, was one telegraph pole and possibly two. Appellant's statement, challenged in the majority opinion, that appellee's view to the west was unobstructed after she reached a point 60 feet from the place of collision was not seriously incorrect. We are not weighing the evidence where we state what the photographs show and draw our conclusions therefrom.

I have made the foregoing computations for the purpose of showing that the train was well this side of the coal dock, at least half way between the coal dock and the crossing, when appellee's automobile was running in low gear 60 feet from the crossing, and that she and her driver approached the crossing with the train in plain view, with its electric headlight burning, and without any obstruction whatever to their view, and that the

only reason they did not see the train was that they negligently failed to look. The engineer and the fireman both testified positively and emphatically that the whistle was blown, two longs and two shorts, just west of the coal dock, and that the bell had been ringing automatically since the train left Valparaiso. The good reputation of these men is wholly unchallenged, and there was no evidence to the contrary, neither as to the whistle nor the bell, except the statements of appellee and Watson, her driver, that they did not hear them, which no doubt was true. They were in a Ford sedan, driving in low, over three or four railroad tracks, and if they were so otherwise absorbed that they could not see the electric headlight approaching, it is suggested that they would not have heard a brass band had one been playing.

The look and listen rule is so well established that it hardly seems necessary to cite authorities pertaining thereto.

In *Chicago, etc., R. Co.* v. *Hedges, Admx.* (1889), 118 Ind. 5, 20 N. E. 530, it was held that, where one could have seen an approaching train for 200 feet when nine feet from the track, and stepped immediately in front of a moving train, he was not entitled to recover.

In *Louisville, etc., Co.* v. *Stommel* (1890), 126 Ind. 35, 25 N. E. 863, it was held that failure to avail one's self of opportunities to look and listen, and carelessly venturing upon a railroad track, precludes recovery for the injury.

In *Louisville, etc., R. Co.* v. *Stephens* (1895), 13 Ind. App. 145, 40 N. E. 148, it was held that one having view of a railroad track for 300 feet when 20 feet from it, and going upon the crossing in front of an approaching train, without stopping to look and listen, is contributorily negligent and cannot recover.

In *Union Traction Co.* v. *Gaunt* (1922), 193 Ind. 109, 135 N. E. 486, it was held that a passenger in a vehicle

crossing railroad tracks is not excused from exercising, due care, and if such passenger does not exercise such care as a reasonably prudent person would exercise under the circumstances, such person cannot recover for injury. occasioned by failure to exercise such care.

In *Lake Shore, etc., R. Co.* v. *Boyts* (1897), 16 Ind. App. 640, 45 N. E. 812, it was held that a guest riding with a driver, on approaching a crossing, has a duty to look and listen, if practicable; and, to recover for an injury, he must be free from contributory negligence, and it was further held that one riding with the owner of a team on approaching a crossing, at which a coming car could have been seen 60 or 80 feet from a point 20 or 30 feet from the crossing, and who failed to look and listen, was guilty of contributory negligence.

In *Ohio Electric Co.* v. *Evans* (1922), 77 Ind. App. 669, 134 N. E. 519, we quoted with approval from the Boyts case that, though one "'may be simply a guest, if he has opportunity to do so, it is no less his duty than it is the duty of the driver, when approaching a railroad crossing, to look and listen and to learn of danger and to avoid it if practicable,'" citing a long list of authorities to sustain the rule.

In *Paramore* v. *Denver, etc., R. Co.* (1925), 5 Fed. (2d) 912; Id., 269 U. S. 560, 46 Sup. Ct. 20, 70 L. Ed. 411, it was held that a passenger in the front seat of a Ford automobile who had an unobstructed view for 186 feet before reaching a railroad track, was guilty of contributory negligence as a matter of law for failure to discover a train approaching at the rate of 15 or 20 miles per hour in time to have avoided a collision. In the instant case, the unobstructed view was from a distance of 60 feet from the crossing, but the automobile was traveling in low gear and, of course, at a slow rate of speed. To the same effect see: *Chicago, etc., R. Co.* v. *Sellars* (1925), 5 Fed. (2d) 31; *Trenholm* v. *Southern Pac. R. Co.* (1925),

4 Fed. (2d) 562; *Engstrom* v. *Canadian Northern R. Co.* (1924), 299 Fed. 929. We do not need to cite other cases. These are sufficient to show that the circumstances of this case are well within the "look and listen" rule. When we sustain a verdict such as here, we are saying practically that there are no facts that can be given in evidence that would require the jury to find that a plaintiff seeking damages for injuries is precluded from recovering because of his own negligence or contributory negligence, and that such a thing as negligence, or contributory negligence, does not exist as a defense as a matter of law. When we sustain the verdict herein, we are practically saying to persons traveling upon the highways in automobiles that railroad companies are their insurers, and that, without premium, or other compensation, they can drive negligently, even recklessly, over railroad tracks and into railroad trains with the full assurance that if they suffer injury from such conduct, the railroads will compensate them therefor, and, if they are killed thereby, that the railroad companies will take care of their loved ones. By sustaining such verdicts, we are encouraging negligent and reckless driving rather than putting any restraint upon the appalling situation with which the country is now confronted. If it can possibly be done, persons driving automobiles should be impressed with the thought that a railroad crossing is a place of danger, and that a railroad train, as a rule, cannot be stopped by the operators thereof for the purpose of avoiding a collision with one who drives onto the tracks, and, if they insist on doing so, they must suffer the consequences of their own negligent acts.

I have no hesitation in saying that if appellant was guilty of any of the acts of negligence, and I am not so convinced, still appellee, by reason of her contributory negligence, should not recover.

If, in the face of this record, and with the photographs

before it, the majority of the court should hold otherwise, then certainly it is incumbent on us to see that the jury was correctly instructed as to the law, and that appellant's rights were not prejudiced by erroneous instructions.

The majority opinion quotes from *Cleveland, etc., R. Co.* v. *Miller* (1905), 165 Ind. 381, 74 N. E. 509, that: "In the consideration of an instruction, the initial point of inquiry is, was the jury misled? . . . A cause ought not to be reversed merely because it is obnoxious to verbal criticism." We may well agree to the principles of law quoted therefrom, but we are not to be misled thereby into thinking that the instruction there under consideration was an erroneous instruction, as here. The court in that case cited *Richmond Gas Co.* v. *Baker* (1897), 146 Ind. 600, 45 N. E. 1049, 36 L. R. A. 683, to sustain its opinion that the instruction did not state a wrong principle of law, though stating that it did not commend it as a model, and then, after some discussion, it followed with approval the language it had quoted. The instruction there under consideration was not an erroneous instruction.

The majority opinion seems to rely chiefly upon *Vandalia R. Co.* v. *Fry* (1919), 70 Ind. App. 85, 123 N. E. 124, to sustain the conclusion therein reached. I, together with three other members of this court still sitting as members hereof, concurred in the opinion of the able judge who wrote it, and in his decision; but a more careful study of it convinces me that it should be overruled, so far as it pertains to instructions 6 and 9 given by the court of its own motion. The settled rule that we must consider instructions as a whole and not in detached parts does not apply where erroneous instructions misstating the law are involved, and *Cullman* v. *Terre Haute, etc., Traction Co.* (1915), 60 Ind. App. 187, 109 N. E. 52, cited to sustain the court's conclusion in the Vandalia

case, does not apply to an erroneous instruction. In the Cullman case, the court, after saying of the instruction under consideration that it might be conceded that it was not strictly accurate in all its parts, and that it was not complete, and that it was therefore subject to criticism, then proceeded to analyze it, sentence by sentence, and to show that it was not erroneous, and, along with other instructions, stated the law, further saying that, if appellant concluded that certain matters were omitted from the instruction which might have been included, it was his duty to request an instruction containing such omissions, or that the one challenged be amplified. Thus it appears that the instruction assailed was not erroneous but incomplete. When an instruction is simply incomplete, it must be considered along with the other instructions given to determine whether the jury was properly instructed. Of course, the court is not required to state all the law in one instruction. But that such rule does not apply as to an erroneous instruction was clearly decided in *Indiana, etc., Light Co.* v. *Armstrong* (1923), 79 Ind. App. 486, 138 N. E. 830, in an opinion written by the same judge who wrote the Vandalia case, and concurred in by the same members of the court that concurred in the Vandalia case. In the Armstrong case, a material issue was involved in the instruction, to wit, the negligence of appellant, while here two material issues were involved in the challenged instructions, to wit, the negligence of appellant and the contributory negligence of appellee. This court there stated that in such cases it will be presumed that the erroneous instruction was harmful, and such presumption will prevail, unless it affirmatively appears from the record that it was not prejudicial to the complaining party; and the burden is upon the party seeking to avoid such presumption to show by the record that the error was not prejudicial. After some further discussion, the court

says: "Appellee also relies upon the settled rule that it is not necessary to state all the law applicable to a case in one instruction, but that it suffices if the instructions, taken as a whole, correctly state the law involved. This rule, however, has no application where the law, as stated in an erroneous instruction, is merely contradicted by a correct statement of the law in other instructions, which is the most that can be said in appellee's favor in the instant case. Where such contradiction exists, the harmful effect of the erroneous instruction can only be avoided by its withdrawal." Numerous authorities are cited to sustain the rule announced, in addition to which, I further cite: *Monongahela River, etc., Co.* v. *Hardshaw* (1907), 169 Ind. 147, 81 N. E. 492; *Cleveland, etc., R. Co.* v. *Powers* (1909), 173 Ind. 105, 88 N. E. 1073, 89 N. E. 485; *Indiana Stone Co.* v. *Stewart* (1893), 7 Ind. App. 563, 34 N. E. 1019; *Chicago, etc., R. Co.* v. *Lee* (1902), 29 Ind. App. 480, 64 N. E. 675; *Fuelling* v. *Fuesse* (1909), 43 Ind. App. 441, 87 N. E. 700; *Pittsburgh, etc., R. Co.* v. *Broderick* (1913), 56 Ind. App. 58, 102 N. E. 887; *Evansville, etc., R. Co.* v. *Hoffman* (1914), 56 Ind. App. 530, 105 N. E. 788.

I am tempted to quote further from the Armstrong case, but I will refrain, with a request that the court, and all, read the opinion as the last expression of this court. If we accept the Armstrong case as the law, what will we do with the Vandalia case?

By instruction No. 3, given by the court, the jury was told that, in order to constitute a defense that would defeat the action, it must be proved that contributory negligence was the proximate cause of appellee's injuries. Instruction No. 4 was to the same effect. This is not the law. Contributory negligence, in order to defeat a recovery, does not have to be *the* proximate cause of the injury; it needs to be only *a* proximate cause of the injury. In *Indianapolis, etc., Transit Co.* v. *Edwards* (1905), 36 Ind. App. 202, 206, 74 N. E. 533, 534, the

court, quoting with approval from Beach, Contributory Negligence, states that: """Contributory negligence, in its legal signification, is such an act or omission on the part of a plaintiff, amounting to the want of ordinary care, as, concurring or cooperating with the negligent act of the defendant, is *a* proximate cause or occasion of the injury complained of.""" (Our italics.)

As stated above, and as appears by the photographic pictures, appellee and her driver had a clear and unobstructed view of the approaching train, if they had looked, from the time they were within 60 feet of the track, but they both failed to look. They were both guilty of negligence, but, under these instructions, if the jury believed that appellant was guilty of any negligence that was *a* proximate cause of appellee's injury, then her negligence, though *a* proximate cause of her injury, did not prevent her recovery, for, by the instructions, she could recover unless her negligence was *the* proximate, the sole, cause of her injury. The case of *Vandalia R. Co.* v. *Fry, supra,* states the rule to be that, it is not necessary, in order to prevent a recovery for injuries, that contributory negligence shall have been the sole cause, but it is sufficient if it enters into and forms part of the efficient cause thereof, citing authorities to sustain the rule.

Of course, she could not recover if her negligence was the sole cause of her injury, but neither could she recover if her negligence, as a proximate cause of the injury, concurred with appellant's negligence as a proximate cause. Under these instructions, the jury had only to believe that appellant was guilty of some negligence that proximately caused appellee's injury to return a verdict for appellee notwithstanding appellee's negligence. The same principle was involved in an instruction given in the case of *Indiana Stone Co.* v. *Stewart, supra,* and the court said of it: "This instruction we must regard as

radically erroneous. To sustain it would be to subvert the whole doctrine of contributory negligence as it has been asserted and enforced in our courts from an early day. The contributory negligence referred to in the latter part of this instruction is plainly that which is ordinarily understood to be intended by the use of this term, that is, negligence of the plaintiff which contributes as a proximate cause to the accident. That such contributory negligence defeats his right of recovery, notwithstanding the fact that the negligence of the master was also a proximate cause of the accident, is a rule firmly established by many decisions in our state."

On page 567, the court stated that: "Although the jury were, in other instructions, as in this, told that the rule was that without freedom from contributory negligence there could be no recovery, still such statements did not correct the error in this one. An instruction so radically wrong could only be cured by a withdrawal."

Instruction No. 7 told the jury that appellant could not relieve itself from the charge of negligence in alone giving the statutory signals, if, considering all the facts, it failed to use ordinary care, and that the jury might consider the circumstances and surroundings at the crossing in question, and the speed at which said locomotive was operated at said time, and determine what, if any, signals other than the statutory signals, should have been given by appellant in the exercise of ordinary care, and if it found that appellant failed to give such signals as were so required, then it might find that appellant was guilty of negligence. But the only charges of negligence in the complaint were excessive speed, and failing to sound the whistle and to ring the bell—both statutory signals. Certainly, appellee might not complain of any failure of appellant to give other signals than those which she charged were omitted in her complaint. It was prejudicial error to give this instruction.

By Instruction No. 14, tendered by appellant and refused, the jury would have been instructed that, while it is true that the negligence of the driver of the automobile in which appellee was riding at the time of her injury will not be imputed to her, still if the jury should find it to be a fact from the evidence that the negligence of the driver of the automobile was the proximate cause of her injury, then the verdict should be for appellant. This was a general instruction as to the general effect of the drivers' negligence, and there was no other instruction which fully covered it. It should have been given.

It is my opinion that this cause should be reversed because of the insufficiency of the evidence to sustain the verdict and because of prejudicial error in the instructions.